In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2305

JEROME COLE,

*Plaintiff-Appellant,*

*v.*

BOARD OF TRUSTEES OF NORTHERN ILLINOIS UNIVERSITY, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 3969 — **Frederick J. Kapala**, *Judge.*

ARGUED APRIL 14, 2016 — DECIDED SEPTEMBER 27, 2016

Before POSNER, KANNE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Jerome Cole has worked for Northern Illinois University in the Building Services Department since 1998. He is African-American, and he alleges that beginning in 2009, he experienced race discrimination, retaliation, and a hostile work environment, including the discovery of a hangman's noose in his newly assigned workspace. He sued the university's board of trustees and eleven individual university employees asserting violations of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2, –3, and the Equal Protection Clause of the Fourteenth Amendment. The district court granted summary judgment to the defendants.

We affirm. The hostile work environment claim presents the closest question, but Cole has not shown a basis for employer liability for the alleged harassment. Cole also has not offered evidence that would allow a reasonable trier of fact to find that he was subjected to disparate treatment based on his race. His retaliation claim fails because he has not offered evidence that he engaged in protected activity.

I.  *Factual and Procedural Background*

Plaintiff Cole began working for the Building Services Department at Northern Illinois University in 1998. In 2009, he became a sub-foreman, a non-union position. In 2011, Cole says, he was promoted to foreman. (Defendants dispute the point, saying that Cole was actually an acting sub-foreman who was improperly paid foreman-level wages, but for purposes of summary judgment we accept Cole's version of the facts.) At all relevant times, Cole was the only African-American foreman or sub-foreman in the department.

A.  *Alleged Discriminatory Treatment*

Cole's promotion to sub-foreman marked the start of what he terms a "laundry list of events" amounting to unfair and discriminatory treatment. It began with his own privileges as a sub-foreman. As far as Cole knew, he did not have a budget to order supplies for his assigned work areas, and unlike other foremen, he did not have the authority to place commodity orders. He also believed that friends and family of supervisors in the department were making more money than

they should have. He spoke about those concerns repeatedly with Brian Hart, the assistant superintendent for the department, and with Steven Wilhelm, a Building Services supervisor, and with Jesse Perez, the university's director of administration and labor relations.

In addition to these more general, ongoing complaints, Cole points to some specific events that he argues showed race discrimination. For example, Cole complains that on one occasion, some of his student-athlete workers were required to load scrap metal from areas outside of Cole's responsibility onto salvage trucks. He was concerned that he might be accused of wrongdoing after overhearing that some of the profits from the scrap metal might be missing. He notified Perez of the incident. He also spoke to Sara Cliffe, who was the assistant director of compliance at the university. In another incident, Cole learned of a substantial paper towel purchase made in his name. Concerned that someone might have been using his name without his permission, he reported the incident to Wilhelm and Hart. They assured him they would take care of it. (As far as we can tell, no further trouble ever resulted from either of these incidents.)

On several occasions after 2009, Cole was accused of unauthorized key possession by a number of Building Services supervisors, including Wilhelm, Rhonda Richards, Charlotte Marx, and Tammie Pulak. Cole testified that he never actually had the keys he was accused of possessing, though once he was required to search for a key in the snow when he says Richards knew it was already accounted for.[1] Eventually, Bill

---

[1] Cole testified that Richards also called some of his African-American students "worthless." We discuss below why this remark, as cruel and ill-

Nicklas, who was the acting superintendent of the depart-
ment until he took over as vice president of public safety and
community relations in November 2012, advised Cole not to
go to key control because Marx had threatened to call the po-
lice on him.[2] Cole also testified that he had been told that Pu-
lak instructed the university police to watch him for no legit-
imate reason. He reported the surveillance to Hart. Afterward
he arrived at work one day to find that his door had been
kicked in, his office cleaned out, and his supplies placed on a
cart, all without his knowledge or approval. Cole complained
about the incident to Perez and Cliffe.

In August 2012, Cole filed an ethics complaint with the
university about an array of alleged unethical practices. Ac-
cording to Cliffe, who conducted the investigation, Cole com-
plained that:

- Employees with connections to supervisors were
  being paid more than the standard salaries.

- Employees were supervising their own children.

- Supplies had been ordered under Cole's name
  without his knowledge or authorization.

- Cameras had been recording Cole and his crew.

- Police had called on Cole due to past complaints.

---

founded as we assume it was, does not constitute evidence of race dis-
crimination.

[2] There is some dispute over Nicklas's exact title, but it is immaterial.
There is no doubt that Nicklas eventually began supervising the univer-
sity police.

- A retired university employee still possessed and used his university cell phone.

- There were recording devices in foremen's offices.

Cliffe investigated, and she substantiated three of Cole's complaints: supervisors had supervised their own children, employees' friends and family received special consideration for assignment to special projects, and the retired employee did indeed still have his university cell phone. She found that the rest of Cole's allegations were unfounded.

B. *Demotion and Later Discipline*

In addition to the specific complaints outlined above, Cole was demoted in 2012. In August of that year, Nicklas became the acting superintendent of the Building Services Department. He learned that a hiring freeze was in place. He also became aware that Cole and Ruth Stone, an acting sub-foreman in the same department, had been promoted without attention to proper procedures.[3] Because Cole and Stone were in an unusual situation, Nicklas testified, he tried to ensure proper procedures going forward while being as "fair as possible" to those who would be affected by the changes. For Cole and Stone, this meant placing them on the hiring register regardless of their test scores but requiring them to interview for sub-foreman positions along with other candidates. Cole and Stone completed the hiring process as modified. Both accepted jobs as sub-foremen beginning November 1, 2012. They received the sub-foreman pay rate and were subject to

---

[3] Nicklas also testified that Cole and Stone were receiving unjustified salaries, paid at the foreman level for non-foreman work. For summary judgment purposes, we must assume that Cole actually was promoted to foreman and that foreman-level pay was justified.

the normal six-month probationary period. Since this case is before us on appeal from summary judgment, we assume this hiring process constituted a demotion. It is undisputed, however, that Stone, a white woman, was demoted at the same time Cole was, and on the same grounds.

Following his six-month probationary period, Cole was disciplined twice. On July 25, 2013, he received a written warning for non-compliance with instructions and "borderline insubordination" based on his failure to follow directives and poor job performance. On September 17, 2013, Cole received a recommendation for a three-day suspension for disruptive behavior in the workplace, failing to obtain supervisors' approval when he could not work a scheduled shift, and "using improper employee evaluation protocol." Cole has not presented additional evidence relating to those disciplinary actions or provided details to put into dispute the reasons the defendants have offered for the discipline.

C. *Noose Incidents*

The most troubling incident Cole describes occurred in mid-November 2012, when he discovered a hangman's noose in his new work area. Cole threw the noose away, but inexplicably, the next day he discovered the same or possibly a second noose outside the building. A department sub-foreman, John Holmes, told Cole that Holmes, Richards, and non-defendant Rich Carter had found the noose earlier in an office on the other side of Cole's new work area. Holmes was inconsistent about what had happened to the noose after that earlier discovery. He first said he had left the noose with Richards and Carter but later claimed he had thrown it out.

Cole called two police officers he knew for advice. Both advised him to "keep his cool" to try to "smoke out" the perpetrator. Cole took the noose to the university police department. He later e-mailed Richards and told her that he had discovered a noose and taken it to the police. The e-mail followed the advice Cole had received from his acquaintances. He told Richards that he thought nothing of the incident; that he assumed Fred Warning, a former employee, had left the noose in his workspace and was just "being silly;" that he was not offended; and that he hoped nothing came of it because to him it was "no big deal." Because we must resolve factual disputes in Cole's favor at this point, we accept his testimony that he was privately offended by the noose and that he was maintaining a nonchalant façade in the hope of leading the perpetrator to identify himself.

On November 20, Cole spoke with Richards about the noose. Cole stuck to his plan, telling Richards that he was not upset. Richards, however, was upset. She asked Cole why he had not gotten rid of the noose after he found it the first time. Cole was offended that she appeared to blame him for finding the noose at all. Cole later spoke to Cliffe about the matter. He told her that he was not offended by the noose but that Richards had offended him by her reaction. For her part, Richards took Cole's e-mail to the police station and turned it in to Nicklas along with her own handwritten notes on the incident. She also spoke to Perez and Daurer about the incident. Perez in turn told Cliffe, prompting the conversation she eventually had with Cole.

By February 2013, the university police had begun an investigation. Detective Dan Mojica interviewed Holmes, who repeated his story about how he, Richards, and Carter had

found the noose in October 2012. Holmes also told Mojica that nooses had been found in the work area for years.[4] After the interview, Holmes told Richards that he had spoken to police. Richards and then-department head Daurer were upset that they had not been informed of the impending interview before it actually happened.

During his investigation, Detective Mojica also spoke to Cole, who once again said that the noose had not upset him. Mojica would have continued his investigation, but for reasons he did not know, his supervisor eventually directed him to stop the investigation. The person who left the noose in the break room was never identified. It is unclear what became of the noose. Around the same time that Mojica was told to halt his investigation, he learned that the noose was "gone."

The police investigation, which ultimately proved fruitless, was the only substantial step the university took after the noose incident. As noted, Richards told Nicklas of the incident, and she notified Perez and Daurer about it. But she never conducted any meetings with Building Services workers to discuss the incident or how inappropriate it was to bring a noose on the premises, nor did she ask Pulak to hold a seminar about hate crimes or race discrimination. In fact, it is undisputed that once the police began their investigation, Richards and Daurer did nothing further to investigate or remedy the incident at all, leaving it in law enforcement's hands. Cliffe, too, let the matter drop after interviewing Cole because he had said he was not offended.

---

[4] Cole may offer this statement for the truth of the matter asserted as the statement of the agent of a party opponent. See Fed. R. Evid. 801(d)(2).

Nothing in the record suggests that the noose incident has been repeated. In fact, there is no evidence of subsequent racial tension in the Building Services Department in this record, with one exception. Cole testified that at some point, one of his crew members told him that he had discovered a sign reading "No blacks allowed past this point." Cole did not explain where or when the sign was discovered, nor did he ever see it firsthand. We have no further details on this incident.

D. *District Court Proceedings*

Cole brought claims for race discrimination in violation of Title VII and the Equal Protection Clause of the Fourteenth Amendment alleging a hostile work environment, disparate treatment, and retaliation. The district court granted defendants' motion for summary judgment. The court rejected the hostile work environment claim, holding that (1) most of the hostile events were not based on Cole's race; (2) Cole had not produced evidence that the noose was intentionally left for him to find; and (3) Cole had not shown a basis for employer liability. On the Title VII claim of disparate treatment, the court held that Cole had failed to present direct or circumstantial evidence permitting a reasonable jury to infer discriminatory intent. Nor had he presented evidence of a similarly situated employee outside his protected class who was treated more favorably, undermining his ability to prove his claim by circumstantial evidence. On the retaliation claim, the court held that Cole had not engaged in activity protected by Title VII because he had not complained of racial discrimination.

The district court then turned to Cole's equal protection claims under 42 U.S.C. § 1983. With the exception of Nicklas, none of the individual defendants was personally involved in causing any alleged violations of Cole's constitutional rights,

as required to collect damages from an individual under § 1983. See *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014). Cole's claim against Nicklas failed for the same reasons that his Title VII claims failed against the university. See *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012). Cole has appealed. We have jurisdiction under 28 U.S.C. § 1291.[5]

II. *Analysis*

We review *de novo* the district court's decision to grant summary judgment. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 462 (7th Cir. 2016). The question on summary judgment is whether defendants showed that there is no "genuine dispute as to any material fact" and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In our analysis, we construe all factual disputes and draw all reasonable inferences in favor of Cole, the non-moving party. *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015).

Cole has asserted claims of racially disparate treatment, retaliation, and hostile work environment, in violation of Title VII of the Civil Rights Act of 1964. He has also brought a claim for race discrimination against each of the individual defendants pursuant to 42 U.S.C. § 1983, invoking the Equal Protection Clause of the Fourteenth Amendment since the university and its employees are state actors. We address his theories in turn, beginning with the hostile environment theory to which he devotes most of his attention.

---

[5] Cole had also asserted claims under 42 U.S.C. § 1981, but the district court correctly held that § 1981 does not create a private right of action against state actors. See *Campbell v. Forest Preserve District*, 752 F.3d 665, 671 (7th Cir. 2014). Cole has not pursued the § 1981 claims on appeal.

A.  *Hostile Work Environment*

Harassment sufficiently severe or pervasive to alter the terms and conditions of employment is actionable under Title VII as a claim of hostile work environment. *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009), citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To prove a claim for hostile work environment based on race, an employee must show that: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Id.* (footnote omitted), quoting *Williams v. Waste Management of Illinois, Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004).[6]

The crux of Cole's claim is his discovery of the noose in November 2012. The first and second prongs of the analysis are easily met. The noose undoubtedly qualifies as "unwelcome harassment." Given its disturbing history and status as a symbol of racial terror, we have no difficulty assuming that the harassment could be treated as based on race. *Erie Foods*, 576 F.3d at 635–36; see also *Dobbey v. Illinois Dep't of Corrections*, 574 F.3d 443, 445 (7th Cir. 2009) (in Eighth Amendment

---

[6] We have sometimes phrased the test differently, replacing the first prong—that the employee was subject to unwelcome harassment—with the requirement that the work environment was "both subjectively and objectively offensive." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). In the *Erie Foods* phrasing, however, that question is subsumed by the question whether the harassment was severe or pervasive enough to rise to the level of a hostile work environment. See, e.g., *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010). In the end, the inquiry is the same.

context, recognizing "the ugly resonance of the noose" and referring to its display as "racial harassment").

Before turning to the third and fourth prongs of the analysis, we briefly address an important nuance of the requirement that the harassment be based upon race. It was on that basis that the district court pared down Cole's hostile work environment claim to encompass only the discovery of the noose, finding insufficient evidence that the other incidents were racially motivated. Although a connection between the harassment and the plaintiff's protected class need not be explicit, "there must be *some* connection, for 'not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority.'" *Zayas v. Rockford Memorial Hospital*, 740 F.3d 1154, 1159 (7th Cir. 2014), quoting *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005).

Nevertheless, forms of harassment that might seem neutral in terms of race (or sex or other protected status) can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status. See *Landrau-Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 614 (1st Cir. 2000) ("Alleged conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim."); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) ("[W]e underscore that [the co-worker's] conduct need not have been explicitly sexual or racial in order to create a hostile environment … . The complained of conduct

must have either a sexual or racial character *or purpose* to sup-port a Title VII claim.") (emphasis in original). Evidence that a workplace is tainted by overt racial hostility can support an inference that other harassment that at first seems race-neu-tral also has an undercurrent of racial animus. See, e.g., *Henderson v. Irving Materials, Inc.*, 329 F. Supp. 2d 1002, 1010 (S.D. Ind. 2004). A harasser's actions or remarks that do not seem based on unlawful animus may be "sufficiently intertwined" with discriminatory remarks to conclude that discriminatory animus motivated all of them. *Shanoff v. Illinois Dep't of Human Services*, 258 F.3d 696, 705 (7th Cir. 2001). Whether the infer-ence is appropriate depends on the circumstances of the case; if so, the superficially neutral events are properly considered as part of "the entire context of the workplace." *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002).

That said, we agree with the district court that the record in this case does not support a reasonable inference that most of the hostility Cole encountered was connected to his race. There is almost no evidence of racial animus in the record: no hostile or ambiguous remarks, no racial slurs, nothing beyond the notable exception of the noose itself and the later secondhand report of a racist sign posted somewhere, at some unknown time by some unknown person. The other events on Cole's list—the paper towel order, the scrap metal, and so on—are connected to race only insofar as they happened to Cole and Cole alone, and he was the only African-American foreman on staff. As *Zayas* and *Beamon* suggest, that by itself is not enough to raise a genuine factual dispute as to whether those events constitute race-based harassment. The same is true of the remarks Richards made about Cole's student work-ers. Calling them "worthless" may have been reprehensible but without more did not amount to race discrimination

solely because they were African-American. *Zayas*, 740 F.3d at 1159.

The hostile environment claim thus depends on the discovery of the noose and the ineffectual investigation. The absence of further instances does not necessarily defeat Cole's claim. "One instance of conduct that is sufficiently severe may be enough." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). An assault, for example, may create an objectively hostile environment even if it is an isolated occurrence. *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008). In addition to the questions of severity and pervasiveness, in determining whether an environment is sufficiently abusive to be actionable, we are guided by factors such as whether conduct is "physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012), quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).

The district court concluded that the environment was not actionable because Cole could not produce evidence that the noose had been displayed or intentionally left *for him* to find. We hesitate to conclude that a single factor like this is dispositive, particularly because the evaluation of hostile work environment claims depends so much on the facts and circumstances of a particular case. *Lapka*, 517 F.3d at 982 (citation omitted). Given the status of the hangman's noose as "a visceral symbol of the deaths of thousands of African-Americans at the hand of lynch mobs," *Erie Foods*, 576 F.3d at 636, we do not flatly reject as "insufficiently severe" an entire set of cases involving such claims. On the other hand, evidence that a noose was displayed or directed toward a particular person

or group could certainly prove relevant. A noose on display is generally likely to have more of an impact on employees than one hidden away in a co-worker's desk. Likewise, a noose directed at a particular employee or group would fall more toward the "physically threatening" end of the scale than the "merely offensive" end and is thus more likely to be actionable.

These cautions aside, we need not and do not lay down here firm rules for when a noose in the workplace is or is not severe enough to be actionable. Cole failed to present evidence to support the fourth element of his claim: a basis for employer liability. Employers are strictly liable for supervisor harassment, *Williams*, 361 F.3d at 1029, but when a plaintiff claims that co-workers are responsible for the harassment, "he must show that his employer has 'been negligent either in discovering or remedying the harassment,'" *id.*, quoting *Mason v. Southern Illinois University*, 233 F.3d 1036, 1043 (7th Cir. 2000). There is no evidence that a supervisor was involved in leaving the noose, so Cole must instead present evidence allowing a reasonable jury to find that the university was negligent—which means in this context that it failed to take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring," *Erie Foods*, 576 F.3d at 636, quoting *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000).

A prompt investigation is the first step toward a reasonable corrective action. See *Erie Foods*, 576 F.3d at 636, citing *Lapka*, 517 F.3d at 984. The undisputed facts here show that once Cole notified Richards of the discovery of the noose, she spoke to him about it (albeit insensitively, we must assume) and delivered her own notes on the incident to the university

police. She also reported the incident to Nicklas, then vice president of public safety and community relations, as well as Perez and Daurer. She did nothing more after that, but in these circumstances it was reasonable for the administration, having involved the university police, to leave the investigation to them.

To be clear, we do not hold that an employer necessarily fulfills its responsibility to take appropriate corrective action if it has reported an incident to some other party. The question is whether the employer took corrective action "reasonably likely" to prevent harassment from recurring. In some cases—perhaps many cases—turning a matter over to someone else and taking no further action may not be enough. But under the circumstances shown by undisputed facts here, the university was not negligent. When Cole informed Richards that he had discovered the noose, he also told her that he had taken it to the police; that he believed it was intended as a joke by an employee who had since retired; that he was not offended; and that he hoped nothing would come of the matter. When Cliffe investigated the matter, Cole told her the same thing. Under those circumstances—faced with an incident that lacked any other threatening overtones and that Cole himself characterized as a joke by someone no longer employed in the department—it was reasonable for Richards to leave the matter to university police once she had reported it and to forgo additional action within the Building Services Department.

Cole suggests that this holding would undermine an employee's ability to recover for a hostile work environment if the employee downplays the effects of that environment on himself. We do not endorse such a rule. An employer may be

negligent in failing to take reasonable measures to prevent additional harassment even if the victim feigns unconcern about an incident or asks the employer not to pursue it. Such requests could come out of fear of retaliation or escalation. The employer's responsibility is to protect its employees from hostile, abusive situations, regardless of how distraught (or not) an employee may appear about a given incident. We hold only that under these circumstances, the university was not negligent when it allowed the university police to handle the investigation. That Richards reacted badly when Holmes was questioned, that the investigation ended without identifying the perpetrator, and that the noose was later lost have no bearing on that conclusion. Those facts have no effect on whether the steps taken to prevent future harm were reasonable. *Erie Foods*, 576 F.3d at 637. To the extent Cole means to suggest a conspiracy to protect the perpetrator, we see no evidence of that in this record.

Cole also points out that, according to Detective Mojica, Holmes said during his interview that Richards had been present in October when the noose was first discovered and that nooses were "not uncommon" in the department. But there was no follow-up by Cole. How "common" is "not uncommon"? What if anything did Richards do if she was in fact present when the noose was discovered in October 2012? A reasonable jury could not find that the university was negligent by failing to do more to prevent the later discovery of the noose based solely on that vague testimony. The same is true of the "No blacks allowed" sign. We know nothing about where it was, when it was discovered, who put it there, and what steps if any were taken in response.

Bad "joke" or not, the presence of a hangman's noose in the workplace is not acceptable. But based on the circumstances here, including Cole's reaction and the fact that the Building Services Department turned the matter over to the police for investigation—a reasonable maneuver instigated by Cole himself—we see no basis for employer liability in this case. Accordingly, the district court correctly granted summary judgment on Cole's hostile work environment claim.

B. *Disparate Treatment*

Cole next contends that he was subjected to disparate treatment based on his race in violation of Title VII and the Equal Protection Clause when he was demoted from foreman to sub-foreman in 2012, with his pay reduced accordingly. See 42 U.S.C. § 2000e-2(a)(1). The same requirements for proving race discrimination apply to claims under Title VII and the Equal Protection Clause, so we consider them together. *Swearnigen-El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 860 n.6 (7th Cir. 2010); see also *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013) (analyzing constitutional race discrimination claim under same standards as Title VII claim).

We look past the "ossified direct/indirect paradigm," see *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013), to address the critical question, which is simply "whether a reasonable jury could infer prohibited discrimination," *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013) (collecting cases); see also *Ortiz v. Werner Enterprises, Inc.*, No. 15-2574, — F.3d —, —, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016) ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'in-

direct' evidence."). Cole offers no direct evidence of racial motivation in any adverse employment actions. He points to the "laundry list" of events he experienced—the scrap metal incident, the repeated accusations of unauthorized key possession, et cetera—and the discovery of the noose in his workspace. But none of these events, with the notable exception of the noose, has even an arguable connection to Cole's race. There is no evidence that Nicklas, the decision-maker in the demotion, had anything to do with the noose incident. There simply is no direct evidence that racial animus motivated Cole's demotion. See *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 631 (7th Cir. 2009) (direct evidence is essentially an "admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus" and is "understandably rare"); *Lim v. Trustees of Indiana University*, 297 F.3d 575, 580 (7th Cir. 2002) (direct evidence of discrimination "should 'prove the particular fact in question without reliance upon inference or presumption'" (emphasis removed), quoting *Markel v. Board of Regents of the University of Wisconsin System*, 276 F.3d 906, 910 (7th Cir. 2002)).

Cole also offers no circumstantial evidence of racially discriminatory animus. He has not pointed to any ambiguous statements, suspicious timing, or evidence that the reason given for his demotion was pretextual. See *Good v. University of Chicago Medical Center*, 673 F.3d 670, 675 (7th Cir. 2012) (listing typical categories of circumstantial evidence), *overruled in part on other grounds*, *Ortiz*,—F.3d at—. He suggests that the fact that his demotion and the discovery of the noose followed close on the heels of his ethics complaint constitutes suspicious timing, but that would be relevant to his retaliation claim, if at all.

Cole argues that only he had the "laundry list" of negative experiences and that he was the only African-American foreman in the department, which he suggests should be enough to show that people outside his protected class "received systematically better treatment." Different treatment can be circumstantial evidence of discrimination, but the experiences Cole has identified do not "point directly to a discriminatory reason for the employer's action" in demoting or suspending him, *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus. Cf. *Beamon*, 411 F.3d at 863 (for purposes of evaluating a hostile work environment claim, "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority").

In fact, Cole was demoted at the same time and for the same reason as a white employee, Ruth Stone. Nicklas's affidavit is unrebutted: when he became acting superintendent of the Building Services Department, he learned of irregularities in the way some employees had been promoted, including Cole and Stone. As a compromise remedy, Nicklas allowed both to interview for sub-foreman positions without regard to their test scores, and both Cole and Stone accepted positions as sub-foremen beginning November 1, 2012. The undisputed facts show that Cole was treated exactly the same as a similarly situated employee outside his protected class. (We have few details regarding the 2013 disciplinary incidents, but Cole has not cited anything about these incidents that suggests he was treated less favorably than other non-African-American workers in his position.)

Cole argues that Stone was not in fact similarly situated because she did not endure the "laundry list of events" that he did. The argument is not persuasive. First, even if Stone were not a proper comparator, that fact could not remedy Cole's own *lack* of evidence of discriminatory motive. As plaintiff, Cole has the burden to respond to a proper motion for summary judgment by offering enough evidence to allow a reasonable jury to find in his favor on the issues raised. His argument also fails on the merits. We have often said that similarly situated employees need to be directly comparable only "in all material aspects," not "identical in every conceivable way." *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014), quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). To assess whether Cole's demotion was motivated by race, it is hard to imagine a better comparator than Stone. She was demoted at the same time by the same person with the same offered justification. Cole also argues that he and Stone did not have the same supervisor, a fact that can frequently though not always undermine an argument that two employees are similarly situated. But here the decision-maker was the same, so the fact that Cole and Stone had different immediate supervisors at some point does not undercut the comparison. E.g., *Good*, 673 F.3d at 676 (employees with different immediate supervisors were still meaningful comparators where "a common decision-maker decided to demote them").

Without direct or circumstantial evidence of disparate treatment based on race, no reasonable jury could find that Cole was demoted or disciplined because of his race. The district court properly granted summary judgment on these claims.

C.  *Retaliation*

Finally, Cole contends that the university retaliated against him for filing the ethics complaint in August 2012. Title VII prohibits discriminating against an employee "because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). To succeed on such a claim, Cole must show that he engaged in a statutorily protected activity. *Orton-Bell v. Indiana*, 759 F.3d 768, 776 n.6 (7th Cir. 2014). This requires more than simply a complaint about some situation at work, no matter how valid the complaint might be. To be protected under Title VII, his complaint must have indicated "the discrimination occurred because of sex, race, national origin, or some other protected class. … Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* at 776, quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Nothing in Cole's ethics complaint suggested that he was complaining of race discrimination. The grievances he listed had no overt connection to race. He raised allegations of incorrect pay, employees' supervision of their own children, commodity orders under his name, improper use of university supplies, the break-in at his office, the scrap metal incident, and unjustified police surveillance. He did not mention race or race discrimination in his complaint at all. His argument is that he was *implicitly* complaining of race discrimination because he was the only African-American foreman or sub-foreman in the department and the only subject of the conduct of which he complained. But his membership in a protected class, without anything more, is not enough to

transform his general complaint about improper workplace practices into a complaint opposing race discrimination. See, e.g., *Tomanovich*, 457 F.3d at 664 (complaint of pay discrimination was not protected activity where employee "did not claim that the discrimination resulted from his national origin or his membership in another protected class"); *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) (complaints about "management style, in general terms" were not protected activity under Title VII). The district court correctly granted defendants summary judgment on the retaliation claim.

The judgment of the district court is AFFIRMED.