In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-2166

TONNETTE JONES,

*Plaintiff-Appellant,*

*v.*

AVIK DAS, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-01319 — **Mary M. Rowland,** *Judge.*

———————————

ARGUED SEPTEMBER 9, 2025 — DECIDED JANUARY 22, 2026

———————————

Before ST. EVE, LEE, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Tonnette Jones worked as a proba-
tion officer with the Cook County, Illinois Juvenile Probation
Department. In early 2018, the Department terminated her,
citing performance issues and insubordination. But Jones
claims her supervisors created a hostile work environment
based on her race. Through her union, Jones unsuccessfully
challenged her termination at arbitration. She then sued in
federal court, alleging that her employer created hostile

conditions of employment that violated Title VII. The district court granted summary judgment to Jones's employer on that claim. We affirm.

## I. Background

In reviewing the district court's grant of summary judgment in favor of Jones's employer, we construe all facts and draw all inferences in the light most favorable to Jones. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Jones is African American and was employed as a Juvenile Probation Officer with Cook County's Juvenile Probation Department from February 2015 to March 2018. As a probation officer, Jones's primary role was to conduct social investigations, memorialized in written reports and shared with the court to aid in sentencing. The Department required a supervisor to review and approve draft reports before submission to the court. Jones's claims in this case arise from a series of incidents between March 2016 and her termination in March 2018 that she argues, taken together, constituted a hostile work environment.

In 2015 and 2016, Jones reported to Ron Dussman, who is white. Dussman generally gave Jones positive reviews for her performance. In January 2017, Eileen Kintzler, who is white, became Jones's immediate supervisor. Kintzler reported to deputy chief probation officer Karen Kelly, who is African American. Avik Das, who is Indian American, was the Department's director.

In March 2016, while he was the director, Das said the N-word during a meeting with a group of African American probation officers. At the meeting, Das read the epithet aloud

from a document (prepared by a different probation officer) that quoted a judge who had used the inappropriate language while moderating a program for juvenile probationers. Jones was not present at the meeting but learned about the incident afterward.

Then, in July 2017, Jones had a disagreement with Terri Griffin, the Department's liaison with the Illinois State Police laboratory, over a DNA sample Jones had collected. In complaining about this incident to Kintzler and Kelly, Jones referred to Griffin as unprofessional and expressed that she would prefer not to interact with Griffin further.

In a separate series of events beginning in early 2017, Jones's children would wait in her office after school until she finished work. Das and Kelly told Jones that this was prohibited as a matter of Department policy. Jones contests the existence of this policy, and Das testified that he could not recall whether it was in writing. Jones's union representative, Jason Smith, stated that he had never seen such a policy. In September 2017, Kelly saw Jones and Jones's son walking in the building's lobby, which is open to the public. Kelly emailed Jones to remind her of the Department's no-children-in-the-workplace policy. Jones responded that she felt targeted by this email, was planning to contact her attorney, and was willing to discuss it further only with the Sheriff's personnel, who were responsible for security in the building.

While with the Department, Jones had a modified schedule so that she could complete her workday in time to pick up her children from school. In August 2017, Jones was unable to take a particular juvenile client to his scheduled mental health assessment due to a conflict with her modified schedule. Jones initially sought Kelly's approval to modify her schedule

further to accommodate the appointment. As a solution, Kelly offered Jones "flex time" (where Jones could bank those extra hours worked), but Jones declined, and did not take the client to the appointment.

The next month, Jones submitted to Kintzler a draft social investigation report for the juvenile client with the missed appointment. In the draft, Jones wrote two paragraphs detailing that management had denied her request for an accommodation to her schedule to explain why the appointment had been cancelled. Kintzler directed Jones to delete these paragraphs, believing these behind-the-scenes details were inappropriate to include in a court record. The draft otherwise conveyed that the assessment had been completed. In Jones's view, the deleted paragraphs "exonerated a juvenile client who missed his mental health assessment." Following Kintzler's directive, Jones submitted the social investigation report to the court without the two paragraphs. But at the juvenile's next hearing, Jones gave the judge a separate document containing the two deleted paragraphs and told the judge that her supervisor had her remove them from the report.

Kintzler reported that around the same time, she heard Jones refer to Kelly as "bipolar" during a workplace conversation. Jones denies making this statement.

In October 2017, Kintzler instructed Jones to prepare a social investigation report for a juvenile, T.L., with a history of involvement in sex trafficking. Jones was to incorporate the findings from the Department's already-completed sex trafficking assessment of T.L. into her report. Probation officer Kisha Roberts-Tabb had filed the assessment with the court in April 2017. Jones first asked Roberts-Tabb for the assessment, but Roberts-Tabb directed Jones to ask the judge's permission

to obtain a copy from the court. Jones asked the judge for permission to see the assessment, which caused confusion and prompted the judge to request to speak with Kintzler.

Jones submitted her draft social investigation report to Kintzler for review two days before T.L.'s hearing in December 2017. The draft included two paragraphs detailing internal discussions between Jones, Kintzler, and Roberts-Tabb about the assessment, and reflected that Jones never received the assessment from the court. Kintzler sent revisions back to Jones, asking her to delete the paragraphs about the assessment and to report only that Roberts-Tabb had done the assessment, which had been submitted to the court, but that Jones did not have a copy. Jones declined to make that revision because she believed it was false to report that the assessment had been submitted to the court. In Jones's view, Kintzler was thus instructing her to commit perjury. However, at that time, Roberts-Tabb had already told Jones the assessment had been submitted to the court.

Over the next two days in the lead-up to T.L.'s hearing, Jones refused to revise the report despite repeated reminders from Kintzler. Instead of making the revisions, Jones lodged a complaint about Kintzler with the Sheriff, claiming that Kintzler had requested the revisions "or else"—a threat. Ultimately, the hearing went forward with the partially revised version of T.L.'s report, which Kintzler provided to the court and the parties. After the hearing, Jones made a complaint against Kintzler with the Chicago Police Department.

In December 2017, Kelly met with T.L. According to T.L., Jones said T.L. was not going to be released from custody because Jones's supervisor (referring to Kintzler) was racist. The

next month, T.L. recanted her statement, saying that she had made it under pressure from Kelly.

The day after T.L.'s hearing, Kintzler made a formal complaint to Das regarding Jones's conduct. Das placed Jones on temporary suspension and initiated an investigation. During the investigation, three documents surfaced that Jones had authored.

First, in a note that Jones had entered in the Department's electronic file for T.L., Jones included her personal grievances against Kintzler. Second, in a letter that Jones wrote to a juvenile's school, she wrote that the juvenile needed to attend a meeting with her "or risk going into custody." Third, in a letter that Jones wrote to a juvenile's mother requesting that she enroll her son in a rehabilitation program, she had warned "[i]f you fail to respond it would force the minor to become a ward of the Department of Child and Family Services."

For the first note in the Department's file, Das deemed it improper for Jones to include employment issues unrelated to the child in T.L.'s file, as the juvenile court often requested that such notes be entered into the public record. And Das viewed the two client letters as inappropriately coercive.

After the investigation, Jones was terminated in March 2018. Das's written disciplinary decision terminating Jones cited her repeated insubordination and performance issues.

In November and December 2017, Jones filed charges with the Equal Employment Opportunity Commission for discrimination and retaliation. Through her union, Jones also challenged her termination at arbitration under the collective bargaining agreement. The arbitrator sided with the Department after a three-day hearing.

Jones then sued under Title VII of the Civil Rights Act of 1964, alleging that she faced a hostile work environment based on race, and the district court granted summary judgment to the Department. Jones appeals.

## II. Discussion

We review the district court's order granting summary judgment *de novo*. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 812 (7th Cir. 2022). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe the facts and draw all justifiable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. However, we need not credit the nonmovant's subjective beliefs where they are belied by the objective record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

### A. Jones's Hostile Work Environment Claim

Jones argues that she marshaled sufficient evidence to establish that she experienced a hostile work environment based on her race, and that the district court erred in resolving questions of fact in Defendants' favor at summary judgment.

Title VII prohibits employers from discriminating against employees based on race. 42 U.S.C. § 2000e-2(a)(1). To successfully prove a claim for race-based hostile work environment, Jones must establish that: "(1) [s]he was subject to unwelcome harassment; (2) the harassment was based on [her] race; (3) the harassment was severe or pervasive so as to alter the conditions of [her] work environment by creating a hostile or abusive situation; and (4) there is a basis for employer

liability." *Cole v. Board of Trustees of N. Ill. Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016) (internal quotation omitted).

We first assess whether the summary judgment record demonstrates that Jones experienced harassment that permeated her work environment. We then consider whether Jones's employer discriminated against her on the basis of race.

### 1. Pervasive Harassment

Employers violate Title VII when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (internal quotation omitted). Relevant here, we "consider the totality of the circumstances when determining whether conduct is severe or pervasive." *Scaife v. United States Dep't of Veterans Affairs*, 49 F.4th 1109, 1116 (7th Cir. 2022). In making that assessment, we consider:

> (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim.

*Id.* We are mindful that the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation omitted).

Jones cites several incidents from her time with the Department and argues that considered in their totality, they show pervasive harassment. First, she claims that the no-children-in-the-workplace policy was pretextual and weaponized against her by her supervisors. Further, she argues that Kintzler's workplace demeanor toward her reflects pervasive harassment. Lastly, she identifies six instances of perceived false accusations she faced while working in the Department. Taken together, in Jones's view, these episodes "create[d] an abusive working environment" giving rise to a Title VII claim. *Casino Queen*, 739 F.3d at 982.

We discuss each incident in turn, considering the holistic record. *Morgan v. Harris Trust & Savings Bank of Chicago*, 867 F.2d 1023, 1026 (7th Cir. 1989) ("When a rational trier of fact could not find for the nonmoving party based on the record as a whole, there is no trial issue.").

### a. No-Children-in-the-Workplace Policy

Jones disputes the existence of the no-children-in-the-workplace policy. She argues that her supervisors harassed her by invoking the nonexistent policy against her when no other employee had faced similar discipline for having their children in the workplace. Moreover, Jones avers that Kelly never actually observed her violating the policy, as Kelly saw Jones with her son in the lobby of the building, which is open to the public.

But the record as a whole belies Jones's assessment that the policy was invoked as a pretext to harass her. The record instead shows that the Department's policy predated Das's directorship and that Jones's supervisors had previously told her that children were not allowed in the workplace. Further,

Jones was never punished for violating the policy. Rather, Kelly *reminded* Jones about the policy after seeing Jones with her son in the lobby. Then, Jones threatened legal action and told Kelly she was unwilling to discuss the matter with her unless the Sheriff's office was involved.

While this incident was mentioned in her termination letter, only Jones's *reaction* to Kelly's reminder was cited as an example of her insubordination. In this context, the reminder was neither hostile nor even a formal reprimand. And since "[w]e expect a certain level of maturity… from employees," *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018), we conclude that no rational jury could find that Kelly's reminder rose to the level of harassment.

Moreover, Jones herself admitted to previously violating this policy in early 2017 when her children were in the office with her. We thus cannot say that reminding Jones of this policy—which Jones acknowledges she violated—was "physically threatening or humiliating" conduct or "unreasonably interfere[d] with [Jones's] work performance" as is required to support a Title VII claim. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).

### b. Interactions with Kintzler

According to Jones, Kintzler acted "in an irritated and frustrated manner" toward her, did not say "excuse me" before interrupting her, and would politely answer questions from white and Hispanic employees while responding rudely to African American employees like Jones and her colleague Theo Chapman. As in *Abrego v. Wilkie*, supervisors may be "short tempered, hostile, unfairly critical, and disrespectful" without "creat[ing] a workplace permeated with

discriminatory intimidation, ridicule, and insult." 907 F.3d 1004, 1015 (7th Cir. 2018) (cleaned up). Kintzler's rude behavior reflects the sort of relatively minor slights that, if actionable, would risk turning Title VII into a general civility code; they do not amount to severe or pervasive harassment. We hold that these episodes fail to support Jones's Title VII claim on pervasiveness; we separately discuss Jones's arguments that she faced race-based harassment in Section II.A.2.

### c. False Accusations

Next, Jones points out several instances of purportedly false accusations levied by her supervisors that she claims show severe and pervasive harassment. We have recognized that "creating a false paper trail that include[s] manufactured details of reports and meetings with [an employee] and other managers in an effort to hide the true nature of the discharge" is actionable under Title VII. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1025 (7th Cir. 2016).

However, each episode Jones cites as a false papering of the record is either not false or was not relied upon by the Department in disciplining Jones. We discuss each purportedly false accusation below.

*First*, Jones claims that Defendants falsely labeled her as unprofessional for calling Griffin unprofessional. But Jones admitted to sending the email accusing Griffin of being unprofessional, so she was not falsely accused. Jones surely disagrees with her employer's assessment that her reaction to Griffin was itself unprofessional, and reasonable minds may differ as to standards of professionalism. But in Title VII cases, we assess whether the workplace was "both objectively and subjectively offensive, one that a reasonable person would

find hostile or abusive, and one that the victim in fact did per-ceive to be so." *Faragher*, 524 U.S. at 787.

Here, we agree with the district court that no reasonable jury could conclude it was even false—much less hostile, abu-sive, or harassing—for Jones's supervisors to determine that she was unprofessional in this interaction with Griffin and reprimand her accordingly.

*Second*, Jones claims that Defendants falsely chastised her without evidence of her children being in the office. Again, this was not a false accusation: Jones admitted to having her children in the office in early 2017, for which she never faced discipline. And as discussed above, Jones was disciplined not for violating this policy, but for her insubordinate email re-sponse to Kelly.

At the risk of being repetitive, even if a jury determined that the policy did not exist, no rational jury could conclude that Kelly's reasonable request that Jones keep her children out of the workplace (particularly in such a sensitive work-place as a juvenile probation department) constituted harass-ment. Nor could one find that disciplining Jones for her in-subordinate response "create[d] an abusive working environ-ment" within Title VII's meaning. *Casino Queen*, 739 F.3d at 982 (internal quotation omitted).

*Third*, Jones claims that Defendants falsely accused her of overstating her authority in written work product. Again, this is not a false accusation: Jones admitted to sending the two client letters that Das ultimately concluded were inappropri-ately coercive. Jones merely disagrees with her employer's as-sessment that the letters—which warned of incarceration and

removal of custody for non-compliance with her directives—were inappropriate.

Reasonable jurors could *disagree* with Das's assessment of the letters, but no rational jury could determine that it was *hostile, abusive, or harassing* for the Department's director to determine that the letters were overly coercive and thus reflected poor performance. Facing consequences for her "failure to meet legitimate employment expectations" of her supervisors cannot support Jones's claim for hostile work environment. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

*Fourth*, Jones claims that Defendants falsely accused her of insubordination after she refused to misrepresent facts to the court, citing her refusal to include in T.L.'s report that a sex trafficking assessment had already been submitted. Viewing the whole record, Jones was not being asked to misrepresent facts because she was told that the assessment had in fact been completed by Roberts-Tabb and submitted to the court. And Kintzler's revisions explained that Jones personally did not have a copy of the assessment. The record shows Jones had other similar instances of insubordination, too: she provided the court with extraneous detail about her compensatory time request after Kintzler directed her not to.

We therefore conclude that no reasonable juror could find that Defendants pressured Jones to make misrepresentations to the court, let alone that Kintzler requesting Jones to complete her job functions by implementing her edits amounted to harassment. We have observed that "it is hardly out of line for a higher level manager to hold subordinates to the satisfactory performance of a task," as Kintzler did here. *Patton v. Indianapolis Public School Board*, 276 F.3d 334, 339 (7th Cir. 2002).

*Fifth*, Jones claims that Defendants falsely accused her of telling her juvenile client T.L. that Kintzler was a racist. Jones denies she did so, and we accept that denial as Jones is the nonmovant at summary judgment. *Anderson*, 477 U.S. at 255. Jones argues that because T.L. later recanted the false accusation, a jury could find that Kelly coerced T.L. into making it.

However, Jones submitted in the district court that "her Title VII claim is not based on her termination, but rather the hostile work environment she experienced *during her employment*." By the time Kelly reported T.L.'s accusation, Jones had already been suspended, and she never returned to the Department before she was terminated. Thus, no reasonable jury could have found that this episode affected the conditions of Jones's employment. *See Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 561–62 (7th Cir. 2019) (finding that the use of a racial slur did not "alter the conditions of [plaintiff's] employment" because the employer had already "initiated termination proceedings" when it was used).

*Sixth*, Jones claims that Defendants falsely accused her of calling Kelly bipolar. Jones denies making this statement and, as above, is entitled to that denial on summary judgment. But "isolated incidents (unless extremely serious) are not sufficient" to establish a hostile work environment claim. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (internal quotation omitted). Thus, no rational jury could conclude that one instance of reprimanding Jones for a statement she denied making evinces *pervasive* harassment.

### 2. *Racial Animus*

Even if Jones could establish pervasive harassment, she has not met her burden of showing that she encountered pervasive harassment based on her race.

At summary judgment, Jones submitted a letter from her co-worker, Theo Chapman, in support of Jones's allegations of racial discrimination. The district court did not discuss Chapman's letter in its summary judgment ruling, and Jones charges that it erred by effectively excluding it. The letter is neither signed nor notarized, though it contains Chapman's typewritten name at the bottom. It does not purport to have been made under penalty of perjury nor is it verified as true and correct; "[a]s such, we can simply ignore [it]" on appeal. *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1255 n.13 (7th Cir. 1990). Even if we were to consider Chapman's letter, it merely duplicates Jones's other evidence that is insufficient to establish pervasive harassment based on race.

To support her claim that she experienced race-based harassment, Jones relies most heavily on Das's reading aloud of the N-word in a meeting with a coalition of African American probation officers. This is a troubling incident that we cannot ignore.

"No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African–Americans." *Paschall*, 28 F.4th at 815 (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013)). Even "[a] one-time use of the epithet can in some circumstances warrant Title VII liability." *Scaife*, 49 F.4th at 1116. "We have repeatedly treated a supervisor's use of racially toxic language in the

workplace as much more serious than a co-worker's." *Gates v. Board of Education of Chicago*, 916 F.3d 631, 638 (7th Cir. 2019). Racial epithets need not be stated directly to a plaintiff to be actionable, but "remarks that are stated directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand." *Scaife*, 49 F.4th at 1116.

The plaintiff in *Scaife* brought a race-based hostile work environment claim under Title VII after learning from co-workers that eight months earlier, a supervisor in another department had called the plaintiff a "stupid fucking n****r." *Id.* We affirmed summary judgment for the employer, finding that the plaintiff "failed to show that [the supervisor's] use of the N-word outside of her presence, eight months prior, was severe enough for a jury to find that she experienced a hostile work environment based on race." *Id.* at 1117.

We reach the same conclusion here. The record shows that Das said the N-word while reading a quote from a document, contrasting with the *Scaife* supervisor's direct use of the slur to disparage the plaintiff. Jones was not present when Das said the N-word, and it happened nearly a year before Jones's cited instances of harassment began. Perhaps if there were other instances of Das's conduct reflecting race-based hostility, Das's inexcusable decision to utter the N-word could supply evidence of racial bias sufficient to preclude summary judgment. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002) (repeated use of racial slurs was one aspect of an "appalling litany of misconduct"); *Johnson*, 892 F.3d at 904 (describing a "catalogue of the evidence of racist statements" by several supervisors that precluded summary judgment for the employer). But here, as discussed above, there are no

other instances of hostility by Das sufficient to create a genuine issue of material fact.

With that said, a single episode like Das's meeting may preclude summary judgment for the employer in a future Title VII case. That is because "no single act can more quickly alter the conditions of employment and create an abusive working environment" than a supervisor's use of the N-word "in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (internal quotation omitted). For instance, a similar one-time utterance of the slur by a supervisor who otherwise engages in hostile, yet race-neutral workplace conduct could supply evidence that such hostility is in fact motivated by racial animus. We have observed that "[e]vidence that a workplace is tainted by overt racial hostility can support an inference that other harassment that at first seems race-neutral also has an undercurrent of racial animus." *Cole*, 838 F.3d at 896. While that is not this case, we are mindful that there is no bright-line rule and "no 'magic number' of slurs that indicate a hostile work environment." *Cerros*, 288 F.3d at 1047.

But here, we hold that because Jones cannot show pervasive, race-based harassment, her hostile work environment claim fails.

### B. Jason Smith's Declaration

Having concluded that Jones's claim cannot withstand her former employer's motion for summary judgment, we turn briefly to a source of evidence the district court excluded: Jason Smith's declaration.

Jones argues that the district court erred in declining to consider testimony from Smith—the former union

representative for Jones' local AFSCME chapter—because it supplied crucial evidence supporting her claims. While Smith's name appeared in the discovery record and he was known to Defendants, Jones belatedly disclosed him as a witness and produced his testimony in the form of a declaration for the first time in her summary judgment response. The district court excluded the declaration as a discovery sanction.

District courts are afforded wide latitude to decide whether to exclude materials that violate Rule 26(a). *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). We review discovery sanctions for abuse of discretion and uphold a district court's sanction if it is reasonable. *Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011).

While Defendants may have known of Smith given his job with the union, Jones had merely disclosed Smith as a source of documents she produced, not as a witness Jones intended to call in support of claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(i). We thus cannot say it was an abuse of discretion for the district court to ignore Smith's declaration where he was disclosed as a witness only after the close of fact discovery and after Defendants had filed their motion for summary judgment.

Even if the district court had abused its discretion in striking Smith's affidavit, the error would be harmless because "the stricken evidence was insufficient to support a genuine issue of material fact for trial" on Jones's Title VII claim. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001).

Consistent with Jones's own testimony discussed above, Smith swore that Defendants treated African American employees "more negatively and harsher than their white

colleagues," highlighting some colleagues that in his view received milder disciplinary outcomes for engaging in conduct like Jones's. Smith also echoes Jones on the no-children-in-the-workplace policy, testifying that he has "never seen this alleged formal policy." And Smith backed up Jones's view that it was permissible for probation officers to write coercive letters, calling that approach a "common and expected practice." He also corroborated that Das read out the N-word at the meeting, which Defendants do not dispute.

None of that moves the needle for Jones on her hostile work environment claim. Smith's declaration highlights general instances of perceived unfairness in the workplace, not the pervasive, discriminatory harassment required to bring such claims. At best, Smith's declaration corroborates Jones's testimony, but her testimony is insufficient to support her claim.

### III. Conclusion

For the reasons stated above, we AFFIRM the district court's judgment.