# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 6, 2021

Lyle W. Cayce
Clerk

No. 19-50173

Michael Johnson,

*Plaintiff—Appellant*,

*versus*

PRIDE Industries, Inc.,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Texas,
USDC No. 3:18-cv-00044-FM

---

Before Dennis, Elrod, and Costa, *Circuit Judges*.

James L. Dennis, *Circuit Judge*:

This appeal concerns Plaintiff Michael Johnson's claims that his former employer, PRIDE Industries, Inc. ("PRIDE"), violated 42 U.S.C. § 1981 by discriminating against him based on his race and by retaliating when he complained to his superiors about the discrimination. The district court granted summary judgment to PRIDE and dismissed the action. While we agree that summary judgment for the employer was proper as to most of Johnson's claims, we conclude that the district court erred in its ruling on Johnson's hostile work environment claim. Accordingly, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

No. 19-50173

## I.

## A.

PRIDE is a non-profit that employs individuals with disabilities in manufacturing and service jobs. It receives government contracts through AbilityOne, a federal program that requires that at least 75% of a contractor's labor work hours be performed by disabled individuals.[1] PRIDE had an AbilityOne contract to provide facilities services at Fort Bliss in El Paso, Texas.

On March 9, 2015, PRIDE hired Johnson, an African-American, as a general maintenance worker at Fort Bliss. In May 2016, PRIDE promoted Johnson to the position of carpenter. Armando Morales was Johnson's supervisor in both positions.

Johnson introduced evidence of the following events, which we presume to be true for summary-judgment purposes. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). While employed as a carpenter, Johnson endured repeated race-based harassment, with his fellow PRIDE employee Juan Palomares as the primary perpetrator. Palomares, who is Hispanic, supervised a different section of PRIDE's carpentry shop from the one to which Johnson was assigned, but Johnson and Palomares "often" interacted. Although Johnson's summary judgment evidence does not specify the precise dates when the harassment occurred, he testified about several specific incidents.

For example, in one particular episode, Morales, Palomares, and Lalo Carrasco, who worked under Palomares, were having a conversation in

---

[1] The AbilityOne program was established under the Javits-Wagner-O'Day Act, 41 U.S.C. § 46 *et seq.*

Morales's office while Johnson was present. Johnson initially stood by Morales's desk, and when he moved to sit down near the other men, Palomares and Lalo started speaking to one another in a mixture of Spanish and English. The two used the term "cemento," presumably discussing a previous incident involving Johnson and another worker at a cement job site. Palomares was upset about the events that had occurred at the cement job, and he mentioned Johnson's name before saying in Spanish "es mayate." The parties do not dispute that "es mayate" translates to "this n*****." Johnson knew Palomares was referring to him because he was the only black employee in Pride's carpentry shop at the time. And, though Johnson understood only a "little bit" of Spanish, his wife had taught him what "mayate" meant.

In a second episode, Johnson was at a table in an "eating facility" with several other employees, including Palomares. As Johnson put it, the men were "talking about something, and that's when I heard them say something—'mayate' or something." The next day, one of the employees who participated in the conversation apologized to Johnson "for everything that Mr. Palomares was [sic] saying at the table."

There were "other times" when Palomares used the epithet "mayate" in Johnson's presence, as well as other language he perceived as demeaning. Specifically, Johnson claimed that Palomares "always" addressed him as "mijo" or "manos," and that he never heard Palomares refer to anyone else by these names. "Mijo" commonly translates to "my son," while "manos" is Spanish for "hands."[2]

---

[2] Johnson first testified that he understood "mijo" to mean "boy." He later acknowledged that he knew "mijo" meant "son," but he nevertheless found the term to be an offensive diminutive because he was not Palomares's son.

No. 19-50173

One of Johnson's carpentry colleagues, Raymond Yanez, corroborated that Palomares used racially offensive language and generally treated non-Hispanic employees worse than their Hispanic counterparts. In an affidavit, Yanez averred that Palomares regularly used Spanish-language racial epithets in the workplace to refer to black employees, calling them "pinchis mayates," which translates to "f***ing n*****s," and "pinchis negros," which translates to "f***ing blacks." Yanez noted that Palomares specifically used these slurs in reference to Johnson. Palomares also directly belittled Johnson in work meetings, including on one occasion when Palomares told Johnson to "shut up" when he asked a question about a job site.

Besides his use of insults and racial epithets, Palomares mistreated Johnson in various ways related to his employment duties. For example, Yanez stated that Palomares disfavored non-Hispanic employees and Johnson in particular with respect to work assignments. Further, Palomares hid the paperwork Johnson had submitted to be promoted to the carpentry position. Johnson submitted the paperwork twice, but it went missing each time. Several PRIDE employees, including Morales, later told Johnson that they found the paperwork in Palomares's desk.

Sometimes equipment that Johnson needed for jobs would similarly go missing from the warehouse. Palomares was responsible for picking up all of the materials needed for job sites and delivering them to the warehouse. Although the warehouse staff would tell Johnson that Palomares had completed the delivery, Johnson was on several occasions unable to find materials necessary for his specific work, including roof coating and paint. Johnson believes that Palomares took the items in an attempt to interfere with Johnson's work.

No. 19-50173

Beyond his mistreatment by Palomares, several other workplace incidents occurred that Johnson viewed as harassing. For instance, another unnamed colleague once called him "n*****." He also once found a screw drilled into his truck's tire while the vehicle was parked at PRIDE's lot.[3]

During Johnson's employment with PRIDE, he made multiple complaints to his supervisor, Morales; Rhonda Davenport, who served as Johnson's "vocational rehabilitation counselor;" and another PRIDE manager, Sonia Bonham, regarding Palomares's harassing behavior, including his use of "mayate" as well as "mijo" and "manos." Morales told Johnson that he would speak to Palomares. Bonham told Johnson that she, too, had been harassed by Palomares and "that things like this would happen; you've just got to be tough and keep going." Palomares continued to refer to Johnson as "mijo" and "manos" after he complained.

Beginning in February 2017, Johnson was involved in a number of additional workplace incidents that culminated in his resignation. First, the keys to his work truck and a bottle of medicine and batteries for a drill that were stored inside his truck went missing; they eventually turned up on an unnamed supervisor's desk. Later that month, Johnson found a magazine clip loaded with "dummy rounds" on the bumper of his truck. He reported the incident to his supervisor.[4]

PRIDE also formally disciplined Johnson in February 2017 after he angrily confronted Palomares at PRIDE's worksite. As documented by PRIDE, Johnson approached Palomares in the presence of other employees

---

[3] Johnson acknowledged that other vehicles on the premises were also vandalized with screws in their tires, and he stated that he did not know who was responsible.

[4] Both of these incidents were memorialized in notes that Johnson wrote at the time of the events.

and yelled at him to "leave [him] the [f***] alone" and to "stop the mind games." Johnson was written up and directed by management to "follow instructions and remain respectful to all employees . . . and management." Around that time, Johnson also applied and interviewed for a supervisory carpentry position. PRIDE ultimately selected Gary Koenermann, a Hispanic individual, for the position. Unlike Johnson, Koenermann had prior supervisor and management experience, both within and outside of PRIDE.

At the end of February 2017, Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). In a response letter to the EEOC, PRIDE's Human Resources Director, Kathryn Strawder, acknowledged that, on March 25, 2016, before Johnson was promoted to the carpentry position, he reported that Palomares had been harassing him. Specifically, Johnson complained that Palomares called him "mijo" and was involved in his missing promotion application paperwork. Strawder stated that PRIDE interviewed Palomares who admitted to using the word "mijo" but contended he did not use it in a derogatory way. PRIDE ultimately "did not find that any harassment had occurred." Later, in an affidavit, Strawder stated that Johnson made several complaints of workplace harassment to PRIDE during the course of his employment, and that PRIDE investigated and "addressed as appropriate" each complaint.

The EEOC issued a right to sue letter in September 2017.[5] That same month, PRIDE called Johnson in for a meeting to discuss problems with his attendance. During the meeting, Johnson said coming into work was "too stressful," declared that he was resigning, and walked out. He signed a resignation letter—purportedly drafted by PRIDE—that stated he felt

_____

[5] Although EEOC opted not to prosecute Johnson's case, it filed an amicus brief with this court in support of Johnson's appeal.

No. 19-50173

"there were several incidents that occurred during his time with PRIDE . . . that affected his mental health," including "confrontations and/or conflicts with his supervisor and or other coworkers . . . that have caused him stress and anxiety." Per the letter, Johnson resigned "so he can focus on receiving the treatment he needs."

## B.

In December 2017, following his resignation, Johnson filed this suit in Texas state court, alleging that PRIDE violated federal and state employment discrimination laws by maintaining a hostile work environment and taking adverse employment actions against him for discriminatory and retaliatory reasons, including by failing to promote him and constructively discharging him. PRIDE removed the matter to federal court, and the district court subsequently granted PRIDE's motion for summary judgment. The court held that (1) Johnson's hostile work environment claim failed because he did not show that the harassment was severe or pervasive; (2) Johnson's failure to promote claim was unavailing because he did not carry his burden to show that PRIDE promoted other candidates with equal or fewer qualifications in his place; (3) Johnson could pursue his constructive discharge claim even though he had not exhausted his administrative remedies; but (4) Johnson's inability to establish a hostile work environment necessarily precluded him from meeting the higher bar of showing constructive discharge; and (5) Johnson's retaliation claim failed because he could not establish a nexus between protected activity and any adverse employment action, including his alleged constructive discharge. Johnson timely appealed.[6]

---

[6] Johnson's pro se notice of appeal also cited the district court's denial of his motion to amend or alter as an order he was appealing. This court appointed pro bono appellate counsel for Johnson, and appellate counsel's brief expressly abandons appeal of this order.

7

## II.

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 397 (5th Cir. 2007). Summary judgment is only appropriate where the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). In considering a motion for summary judgment, the court must view all facts and evidence in the light most favorable to the non-moving party and draw all reasonable factual inferences in the non-movant's favor. *WC&M Enters., Inc.*, 496 F.3d at 397.

## III.

Johnson contends that he has presented sufficient evidence to raise a genuine issue of material fact as to whether his employer discriminated against him in violation of 42 U.S.C. § 1981. That statute guarantees to "[a]ll persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It defines the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). Johnson asserts that the district court erred in dismissing the following four claims under § 1981: (1) hostile work environment; (2) failure to promote; (3) constructive discharge; and (4) retaliation. We consider "racial discrimination and retaliation claims based on Title VII and 42 U.S.C. § 1981[] under the same rubric of analysis." *Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019) (quoting *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002)). We review Johnson's argument as to each claim in turn.

No. 19-50173

## A.

First, Johnson argues that he raises a genuine issue of fact as to his hostile work environment claim.  We agree.  A hostile work environment exists when the "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).  To establish a claim of hostile work environment, a plaintiff must prove he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on his membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).  The first three elements of the claim are easily established; Johnson is black and his evidence makes clear he was harassed based on his race.  The dispute here centers on the fourth element.

Harassment is sufficiently "severe or pervasive enough" to create a hostile work environment when it is "objectively hostile or abusive"—meaning "an environment that a reasonable person would find hostile or abusive"—and is subjectively perceived by the victim as abusive. *Harris*, 510 at 21.  The Supreme Court has "emphasized . . . that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  The objective inquiry, moreover, requires that the court consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

9

No. 19-50173

interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[N]o single factor is required." *Id.*

In evaluating whether the harassment here was sufficiently severe or pervasive to alter the conditions of Johnson's employment, we first review the most obvious—and obviously offensive—evidence of racial harassment: the use of racist slurs in Johnson's presence. Johnson testified about two specific instances in which Palomares—a supervisor in the same carpentry shop as Johnson, though not Johnson's supervisor[7]—used the word "mayate" in his presence. During both instances, Johnson was the only black person present, and thus the reasonable inference can be drawn that the slur was directed at Johnson. And because Johnson knew from his wife that the term was the Mexican-Spanish equivalent of "n*****," he subjectively perceived the slurs as severely harassing. Johnson also testified that another colleague once called him "n*****."

In addition, Johnson's co-employee, Yanez, described a work environment in which Palomares regularly used racial invective, referring to black employees, including Johnson, as "pinchis mayates"—meaning "f***ing n*****s"—and "pinchis negros"—"f***ing blacks." The district court recognized that "mayate" "has the same taboo status as the n-word."

---

[7] The Supreme Court has "h[e]ld that an employee is a 'supervisor'" for Title VII (and thus § 1981) purposes "if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Johnson does not argue that this standard is met with respect to Palomares, and we therefore assume that Palomares's status vis-à-vis Johnson is one of a co-employee rather than that a supervisor for purposes of § 1981.

No. 19-50173

Neither party disputes this understanding of the term, and so we accept it for the purposes of this appeal.[8]

The magnitude of the offensiveness of being referred to as "mayate" or "n*****" by a fellow employee cannot be understated—particularly when used by a fellow employee who outranked Johnson in the carpentry shop in which the two labored. Our court has observed that the term "n*****" is "[t]he most noxious racial epithet in the contemporary American lexicon." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (quoting *Montiero v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998)); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) ("It is beyond question that the use of the word '[n*****]' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is 'perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry.'" (quoting *Swinton v. Potomac Corp.,* 270 F.3d 794, 817 (9th Cir. 2001)). Far from "a

---

[8] A variety of authorities on Mexican Spanish confirm this meaning. *See, e.g.*, HARRY POLKINHORN ET AL., EL LIBRO DE CALÓ 41 (REV. ED. 1986) (noting the standard meaning of "mayate" as a type of beetle, defining the nonstandard meaning as "black person" and stating that when the term is "used with *pinchi,* [it is] equivalent to [n*****]; *pinchi mayate*; [g*d** n*****])"); TOMÁS ALMAGUER, *Race, Racialization, and Latino Populations in the United States*, RACIAL FORMATION IN THE TWENTY-FIRST CENTURY 143, 155-56 (Daniel Martinez HoSang et al. eds., 2012), http://www.jstor.com/stable/10.1525/j.ctt1pn6cq.13 (last visited Aug. 2, 2021) (noting that "mayate" is "clearly the most commonly used racial epithet invoked by ethnic Mexicans and is always used in a disparaging way" and that its reference to a black Mexican dung beetle "foreground[s] the blackness of [this] insect[] while also providing a sweeping, dehumanizing move in the racialization process"). "In this circuit, we have previously acknowledged that 'mayate' is Spanish slang for dark skinned people and means dung beatle." *Rhines v. Salinas Const. Techs., Ltd.*, 574 F. App'x 362, 365 (5th Cir. 2014) (quoting *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 420 n.3 (5th Cir. 2009)).

mere offensive utterance," this slur is inherently and deeply "humiliating." *Harris*, 510 U.S. at 23.

Pride argues that the occasions in which epithets were used were too isolated to give rise to a hostile work environment. The Supreme Court has recognized that actionable hostile work environment claims generally involve repeated conduct and that "a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). For instance, the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" such as to be actionable. *Harris*, 510 U.S. at 21. Neither will "simple teasing [or] offhand comments" alone be actionable. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

Here, of course, we are not dealing with a single incident of harassment. Johnson testified about two specific uses of deeply degrading racial epithets by Palomares and one involving another, unnamed coworker, and Yanez's affidavit indicates there were other occasions in which similarly vile language was employed outside of Johnson's presence. But these epithets—egregious as they are—are not the only record evidence of harassment, so we need not decide if they alone could suffice to constitute a hostile work environment. *See Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 442 (5th Cir. 2011) (observing that "the required level of severity of seriousness varies inversely with the pervasiveness or frequency of the conduct"). Indeed, viewing the all of the evidence in the light most favorable to Johnson, we do not think the harassment here is properly characterized as isolated.[9]

---

[9] We note that even "isolated incidents" of harassment, if "extremely serious," can create a hostile work environment. *Id.* This must be so because the standard for

No. 19-50173

For instance, a jury could find that Palomares's racial hectoring extended beyond the use of "n*****" and "mayate" to other demeaning terms. According to Johnson, Palomares repeatedly referred to him as either "mijo" or "manos"—in violation of PRIDE's policy mandating that employees be referred to solely by their given names—but never used those

---

actionable harassment is phrased in the disjunctive: the harassment must be severe *or* pervasive. Accordingly, this court has recognized that, "[u]nder the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable" hostile work environment claim. *WC&M Enters., Inc.*, 496 F.3d at 400; *see also Hudson v. Cleco Corp.*, 539 F. App'x 615, 620 (5th Cir. 2013) (recognizing that the display of a "hangman's noose" at an African-American employee's workplace could be the type of "'extremely serious' isolated event" that constitutes actionable harassment (quoting *Faragher*, 524 U.S. at 788)); *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) ("[W]e have often recognized that even one act of harassment will suffice [to create a hostile work environment] if it is egregious."); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (holding that a single incident of physically threatening and humiliating conduct was sufficient to create a hostile work environment for a sexual harassment claim).

Sister circuits have concluded that even the limited use of severe racial epithets can rise to the level of a hostile work environment. In *Boyer-Liberto v. Fontainebleau Corp.*, the Fourth Circuit, sitting en banc, held that a supervisor's use of the racial epithet "porch monkey" on two occasions, without more, constituted a hostile work environment. 786 F.3d at 270, 280 (4th Cir. 2015). The Fourth Circuit reasoned that "this [w]as the type of case contemplated in *Faragher* [*v. City of Boca Raton*] where the harassment, though perhaps 'isolated,' can properly be deemed to be 'extremely serious.'" *Id.* at 280-81 (quoting 524 U.S. at 788); *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[I]n my view, being called the n-word by a supervisor . . . suffices by itself to establish a racially hostile work environment."). Similarly, the Seventh Circuit has held that two instances of a supervisor's use of the n-word in an employee's presence combined with an additional racially offensive remark were sufficient to establish a viable hostile work environment claim. *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668 (7th Cir. 1993) (observing that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as '[n-word]' by a supervisor in the presence of his subordinates" (internal quotation marks and citation omitted)). Because this case does not concern isolated incidents of harassment, we do not decide whether the isolated use of the most odious epithet by Palomares, without more, could constitute actionable harassment.

terms in addressing the other, non-black employees. The district court concluded that neither "mijo" or "manos" are "inherently offensive or derogatory." While neither of these terms are intrinsically offensive—indeed, the district court observed that "mijo" is generally used as a term of endearment—or necessarily related to race, we are mindful that the context in which a word is used is key to determining whether it is offensive or connected with race. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (noting that factors like "inflection" and "tone of voice" can be crucial in determining whether a word is deployed in a racially invidious manner). In American English, there is a long and sordid history of people using diminutives like "boy" to refer to adult black men in a racially invidious manner. *See, e.g.*, *id.* at 456 (explaining that evidence that a supervisor referred to individual black employees as "boy" could constitute evidence of racial discrimination); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885–86 (6th Cir. 2008). And, as stated, we also have a duty to make all reasonable inferences in Johnson's favor. *Anderson*, 477 U.S. at 255. Accordingly, we conclude that Johnson has established a genuine issue of material fact as to whether Palomares used "mijo" or "manos" in an objectively offensive manner. After all, Palomares allegedly used the vilest of racial epithets in Johnson's presence. The interactions between the two are inescapably colored by those epithets, and even seemingly innocuous "nicknames" like "mijo" or "manos" can take on a racially insulting, bullying, or belittling cast when viewed within the full breadth of the relationship between Palomares and Johnson. Whether "mijo" and "manos" were actually used in an objectively offensive racial manner is an issue for the factfinder.

Besides racist epithets, Johnson adduced further evidence of mistreatment by Palomares that a jury could perceive as racial harassment. Specifically, Johnson testified that Palomares hid paperwork he submitted in connection with his application for a promotion at PRIDE. As Johnson

stated, he twice applied to be promoted to the position of carpenter only to have his paperwork go missing. That paperwork was, according to Johnson, ultimately discovered in Palomares's desk.[10] In addition, the affidavit from Yanez, Johnson's co-employee, states that Palomares gave Johnson less desirable work assignments.[11] Considering both the alleged interference with Johnson's efforts to obtain a promotion and the less favorable work assignments in the context of Palomares's verbal harassment, it could be inferred that these actions were likewise motivated by racial animus. *Cf. WC&M Enters., Inc.*, 496 F.3d at 400-01 (explaining that "in the context of" more obvious evidence of religious discrimination, a factfinder could conclude that a harasser's act of banging on the glass partition to a colleague's office, though not overtly tied to religious animus, "was also motivated by" religious prejudice).[12]

---

[10] Johnson testified that his supervisor, Morales, and Bonham, another PRIDE supervisor, informed him that the paper was found in Palomares's desk. PRIDE contends this testimony is inadmissible hearsay. That is incorrect. Morales and Bonham's statements regarding where Johnson's missing promotion application materials were found fall within the hearsay exemption under FEDERAL RULE OF EVIDENCE 801 for statements by an opposing party's "employee on a matter within the scope of" the employment relationship. FED. R. EVID. 801(2)(D).

[11] Although Yanez's affidavit implies that Palomares had authority to assign tasks to Johnson, as noted above, Johnson does not argue that Palomares was empowered by PRIDE "to take tangible employment actions against" him—which is the authority that distinguishes a supervisor from a co-employee under Title VII and § 1981, *see Vance*, 570 U.S. at 424. Indeed, Johnson specifically asserts that the framework for claims of non-supervisory harassment applies.

[12] *See also Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) ("[F]orms of harassment that might seem neutral in terms of race . . . can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." (*citing Landrau–Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 614 (1st Cir. 2000) ("Alleged conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim."))).

We think that the summary judgment record contains sufficient evidence for a jury to conclude that harassment here was not isolated, and, more importantly, that Johnson endured "an objectively hostile or abusive work environment." *Harris*, 510 at 21. Our decision is bolstered by evidence suggesting that Johnson suffered psychological harm as a result of the harassment, forcing him to take a medical leave of absence in March 2017 and go on a reduced schedule when he returned to work in August 2017. A jury could thus conclude that the harassment "unreasonably interfere[d]" with Johnson's "work performance." *Id.* at 23.

To review, and taking the evidence in the light most favorable to Johnson, Palomares used the term "mayate" on at least two occasions in Johnson's presence. Johnson knew this word translated to "n*****." Palomares also regularly used the racist epithets "pinchis mayates" and "pinchis negros." He assigned Johnson less favorable work tasks and referred to Johnson—and Johnson only—as "manos" and "mijo," terms that could reasonably be interpreted as racially pejorative depending on context-specific factors. In addition, Palomares twice hid paperwork that Johnson submitted in his effort to receive a promotion. Johnson also endured harassment perpetrated by another co-employee who once called him "n*****" to his face.[13] And the harassment Johnson suffered arguably interfered with his ability to work at PRIDE. Under the totality of the circumstances, a reasonable factfinder could conclude that the harassment

---

[13] In his brief, Johnson claims that Palomares "stole" materials from the warehouse that Johnson needed for job assignments. Johnson also argues that other workplace episodes—namely, the alleged vandalism of his truck and the placing of a loaded magazine clip on his truck—constitute evidence of race-based harassment. Because we hold that Johnson has raised genuine issues of material fact regarding whether a hostile work environment existed regardless of these additional incidents, we do not address whether their connection to racial animus would be too speculative to withstand summary judgment. *See Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 513 (5th Cir. 1994).

Johnson allegedly experienced at PRIDE was severe or pervasive enough to constitute a hostile work environment.[14] *See id.* at 400.

Although we conclude that Johnson has raised a genuine issue of material fact as to whether the harassment he suffered was severe or pervasive enough to alter the conditions of his employment, that is not the end of the story. To sustain his burden and survive summary judgment, Johnson must also make a sufficient showing that a genuine issue of fact exists

---

[14] PRIDE contends that there is no actionable discrimination, relying chiefly on a panel's unpublished decision in *Johnson v. TCB Constr. Co.* ("*TCB*"), 334 F. App'x 666 (5th Cir. 2009). In that case, after a black employee asked his supervisor for a raise, the supervisor threw the employee's paycheck on the ground. When the employee bent down to pick it up, the supervisor said, "[j]ust like a damn [n*****]." *Id.* at 668 (internal quotation marks omitted) (first set of alterations in original). Although that incident was the only time the supervisor used the slur "n*****" in the employee's presence, the supervisor regularly used that slur outside of the employee's presence and once referred to the employee as "ugly" and "an old hermit." *Id.* Acknowledging that the supervisor's conduct was "highly objectionable," the panel determined that the use of "n*****" in the employee's presence was "isolated" and did not interfere with the employee's work performance. *Id.* at 671 (quoting *Harris*, 510 U.S. at 23). The panel also discounted the supervisor's frequent use of "n*****" because it occurred outside of the employee's presence. *Id.* Accordingly, this court held that the supervisor's conduct did not create an actionable hostile work environment claim.

There are important distinctions between the present case and *TCB*. First, Johnson described at least three instances in which the terms "mayate" or "n*****" were uttered in his presence, whereas in *TCB* "n*****" was used in the plaintiff's presence only once. Accordingly, the alleged use in Johnson's presence of the very most offensive racial epithets was more frequent than the single, "isolated" use of "n*****" in the presence of the employee in *TCB*. *Faragher*, 524 U.S. at 788. Moreover, Johnson testified that he was frequently subjected to other potentially racially offensive epithets and stated that his harasser assigned him less favorable work tasks and hid his job promotion materials. And here, unlike in *TCB*, Johnson has adduced evidence that the harassment affected his ability to do his job. *See Harris*, 510 U.S. at 23. More fundamentally though, we question *TCB*'s reasoning and are not convinced we would reach the same result if faced with the case today. And ultimately, because *TCB* is unpublished, it does not constitute a precedential decision. 5TH CIR. R. 47.5.

regarding the fifth element of his hostile environment claim, *i.e.*, that PRIDE knew or should have known about the harassment and failed to take prompt remedial action. *Ramsey*, 286 F.3d at 268.

An "employer has actual knowledge of harassment that is known to 'higher management' or to someone who has the power to take action to remedy the problem." *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999) (internal citation omitted). "The plaintiff bears the burden of showing that his employer failed to take effective action." *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir. 1999). In this case, Johnson testified that he complained about Palomares's harassment, including Palomares's use of racist epithets, to multiple individuals at PRIDE; in particular, Johnson informed the following individuals that he was enduring on-the-job harassment: Morales, his direct supervisor who was physically present when Palomares referred to Johnson as "es mayate"; Davenport, PRIDE's vocational rehabilitation counselor; and Bonham, a PRIDE manager who, according to Johnson, responded to his complaint by stating "that things like this would happen" and that he had "to be tough and keep going." Moreover, Strawder, PRIDE's Human Resources Director, conceded that Johnson complained to PRIDE on multiple occasions about workplace harassment. Johnson has thus established a genuine fact issue as to whether PRIDE had actual knowledge of the harassment he endured. *See Sharp*, 164 F.3d 929.

The question, then, is whether PRIDE failed to take prompt remedial action in response to its awareness that Johnson was being harassed at the workplace. *See Ramsey*, 286 F.3d at 268. This court "ha[s] held that an employer must take prompt and appropriate remedial action, 'reasonably calculated' to end the harassment" in order to avoid liability. *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989) (quoting *Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir. 1986)). Here, PRIDE's letter to the

No. 19-50173

EEOC makes clear that Johnson had complained to Human Resources personnel at PRIDE regarding harassment by Palomares even before Johnson began working in the carpentry shop. And Johnson testified that, after he started his tenure in the carpentry shop, he complained repeatedly to his direct supervisor and to another PRIDE manager about Palomares's use of racial invective. Despite these complaints, Johnson contends that the harassment continued.[15] *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 466 (5th Cir. 2013) (en banc) (holding that a cursory and ineffectual investigation into a plaintiff's complaints does not constitute prompt remedial action).

Conversely, PRIDE submitted an affidavit from Strawder, the Human Resources employee, averring that Johnson's complaints were investigated and "addressed as appropriate." But, other than interviewing Palomares regarding his alleged harassment of Johnson before Johnson started working in the same carpentry shop as Palomares, PRIDE does not point to any affirmative steps it took to investigate—let alone halt—the harassment Johnson complained of. *See Waltman*, 875 F.2d at 479. Thus, although "[w]hether an employer's response to discriminatory conduct is sufficient will necessarily depend on the particular facts of the case," *Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014). (quoting *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 395, 399-400 (5th Cir. 1996)), we have no trouble concluding that Johnson has created a genuine dispute of fact as to whether PRIDE's response, if any, to the harassment he allegedly endured while he was employed in the carpentry shop was prompt, appropriate, and reasonably calculated to stop the harassment. *See Waltman*, 875 F.2d at 479.

---

[15] Even though Johnson does not specify the precise dates on which he complained to PRIDE management, it is evident from his testimony that he raised objections regarding Palomares's harassment on multiple occasions.

Accordingly, we reverse the district court's summary judgment on Johnson's hostile work environment claim and remand for trial.

**B.**

Johnson next argues that the district court erred in dismissing his claim that PRIDE discriminated against him by failing to promote him to a supervisory position within the carpentry shop.   Under the familiar *McDonnell Douglas* burden-shifting analysis, at summary judgment, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  To establish a prima facie case of discrimination based on a failure-to-promote theory, a plaintiff must show that (1) he is a member of a protected class; (2) he sought and was qualified for a position for which applicants were being sought; (3) he was rejected for the position; and (4) the employer either (a) hired a person outside of the plaintiff's protected class, or (b) continued to seek applicants with the plaintiff's qualifications. *McMullin v. Miss. Dep't of Pub. Safety*, 782 F.3d 251, 258 (5th Cir. 2015).  Next, if the plaintiff carries his burden to establish a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the underlying employment action. *Id.*  And if the employer satisfies this burden, the plaintiff must then provide adequate evidence to show the reason proffered by the employer is a mere pretext for unlawful discrimination. *Id.*

As to the elements of Johnson's prima facie case, the district court correctly recognized that it is undisputed that he has established the first and third elements.  With respect to the first element, Johnson is black and thus a member of a protected class.  Regarding the third element, Johnson has established that he was not selected for the promotion.  However, the district court erred in determining that PRIDE conceded that Johnson satisfied the second element of his claim.  The district court stated that the parties did not dispute that Johnson "sought and was qualified for the position."   But

PRIDE argued in its motion for summary judgment that Johnson could not "identify how he was qualified or what the qualifications of the selected persons were." On appeal, PRIDE continues to dispute that Johnson possessed the necessary qualifications for the position. Although Johnson did offer evidence regarding his own qualifications, he failed to adduce any evidence of the qualifications required for the position sought. Accordingly, Johnson did not establish that he was qualified for the position and therefore has failed to carry his burden to establish a prima facie case on his failure-to-promote claim. *Cf. Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 310 (5th Cir. 2004) (plaintiffs failed to satisfy qualifications prong of prima facie case when they "submitted no evidence that their . . . experience was commensurate with that of" the posted requirements for the position they sought).

## C.

Johnson contends that the district court erred in granting PRIDE summary judgment on his constructive discharge claim. This claim requires a plaintiff, at summary judgment, to offer evidence that the employer made the employee's work conditions "so intolerable that a reasonable employee would feel compelled to resign." *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008). The evidence must demonstrate a greater severity or pervasiveness of harassment than the minimum required to establish a prima facie hostile work environment claim. *Id.* The following events are relevant in determining whether a reasonable employee would feel compelled to resign:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

*Id.* (internal quotation mark and citation omitted).

As an initial matter, PRIDE argues that Johnson's claim is barred due to his failure to exhaust administrative remedies. However, the administrative exhaustion doctrine that PRIDE cites is inapplicable in this case because it pertains only to a Title VII plaintiff and not to a plaintiff, like Johnson, who brings his claims under § 1981. *See Caldwell v. Nat'l Brewing Co.*, 443 F.2d 1044, 1046 (5th Cir. 1971) (holding that the "administrative remedies under Title VII . . . can be deliberately bypassed by a § 1981 plaintiff").

In any event, Johnson's constructive discharge claim fails on the merits. Johnson contends that, in addition to the harassment discussed in relation to his hostile work environment claim, PRIDE's alleged failure to address his complaints of harassment, and the effect that failure had on his diagnosed mental disabilities, constitute constructive discharge. However, none of the factors relevant to whether a reasonable employee would feel compelled to resign are present here. Johnson adduced no evidence that he was demoted or suffered a reduction in salary or job duties.

Additionally, there is only a minimal temporal nexus between the alleged harassment and Johnson's resignation. Johnson filed his EEOC charge on February 27, 2017—nearly seven months before he resigned in September 2017. And he does not allege that any specific harassment or other adverse employment actions occurred during the seven months between these events. Further, in February 2017, PRIDE transferred Palomares outside of the carpentry shop to which Johnson was assigned. Thus, Johnson was not even working in the vicinity of his alleged harasser for nearly the last seven months he was employed by PRIDE. The lack of a temporal connection between the alleged harassment and Johnson's resignation undermines his contention that he was constructively discharged. *See Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 755-56 (5th Cir. 1986)

(concluding that a five-month gap between the last alleged act of harassment and plaintiff's resignation did not support a finding of constructive discharge).

The district court did not err in granting summary judgment in favor of PRIDE on Johnson's constructive discharge claim.

## D.

Johnson also challenges the rejection of his retaliation claim. The *McDonnell Douglas* burden-shifting framework applies, so Johnson has the initial burden to set forth a prima facie case of retaliation. A "prima facie case of retaliation under either Title VII or § 1981" requires that a plaintiff "show that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis*, 383 F.3d at 319. PRIDE does not dispute that Johnson has created a fact issue as to whether he engaged in protected activity by making complaints to the Human Resources Department and sending a letter to the EEOC. Turning to the second element of his prima facie case, Johnson contends he suffered an adverse employment action in the form of his constructive discharge. Because we have already concluded that Johnson was not constructively discharged, he cannot establish that he experienced an adverse employment action in this respect. Hence, Johnson has failed to establish his prima facie case of retaliation. We affirm the district court's grant of summary judgment in favor of PRIDE on this claim.

## V.

For these reasons, we affirm the district court's grant of summary judgment to PRIDE on all claims, with the exception that we reverse its ruling with respect to Johnson's hostile work environment claim. Accordingly, we

No. 19-50173

AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.