# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 18, 2022

Lyle W. Cayce
Clerk

No. 21-30203

---

David Scott Vidrine; Steven P. Bozeman; Zachary Stewart; Larry F. Witmore,

*Plaintiffs—Appellants*,

*versus*

Chad Guillot, As Interim EMS Administrator for Department of Emergency Medical Services for the City of Baton Rouge, Parish of East Baton Rouge; Stacy Simmons, As Communications Chief and in her Individual Capacity; Sharon Weston Broom, Mayor President for the Parish of East Baton Rouge,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:18-CV-538

---

Before Smith, Elrod, and Oldham, *Circuit Judges*.

Per Curiam:*

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-30203

Employees in Baton Rouge's EMS Department allege they suffered sex discrimination. They sued under Title VII and Louisiana law. The district court granted summary judgment to defendants. We AFFIRM.

I.

Appellants are one current and three former male employees of the City of Baton Rouge/Parish of East Baton Rouge Department of Emergency Medical Services ("EMS"). They were (or are) Emergency Communications Officers—basically, EMS dispatchers. They allege that their supervisor, Communications Chief Stacy Simmons, subjected them to sex discrimination and created a hostile work environment.

Appellants point to six specific instances of alleged discrimination recounted by the district court. First, they allege that on one occasion, Simmons stated "there are too many men in communications." Next, they allege five incidents where male employees were disciplined and female employees who engaged in similar conduct were not. Appellees contest all of these allegations.

Beyond these specific incidents, appellants provide a string of record citations they say show regular harassment and unequal treatment. For example, they point to allegations that women were allowed to take longer breaks than men for lunch or to run personal errands, that Simmons did not speak to male employees, and that Simmons said "I don't like men" some number of times between 2003 and 2017.

Appellants Bozeman, Witmore, and Stewart all resigned from EMS following some form of discipline against them. Bozeman was suspended following an argument with a colleague. He was scheduled to return to work on October 9, 2017, following his suspension and counseling. He resigned three days before his scheduled return.

No. 21-30203

Witmore was suspended for viewing sexually offensive material at work. When he returned from his suspension, he was assigned to work with a female colleague and refused to do so. After he was instructed he must work with her, he had a panic attack and took leave under the Family and Medical Leave Act. Then he resigned when that leave was exhausted.

Stewart faced termination for sexual harassment and inappropriate conduct. After a disciplinary process, Stewart signed an agreement with EMS whereby his proposed termination was reduced to a 30-day suspension. In that agreement, Stewart "waived, compromised, released and otherwise discharged EMS from any suit, claim or cause of action specifically included but not limited to any claim of wrongful termination or violations of 42 U.S.C. § 1983 or Title VII of the Civil Rights Act, resulting from, created by, or relating to" his employment with EMS. When he later resigned, there was no pending discipline against him.

Appellant Vidrine is still employed at EMS and alleges he "continues to suffer retaliation for his part in bringing suit against EMS and Simmons."

The four dispatchers brought claims of sex discrimination under the Louisiana Employment Discrimination Law ("LEDL"), LA. REV. STAT. ANN. §§ 23:301, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* The district court granted summary judgment to defendants. Plaintiffs timely appealed. Our review is *de novo. Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 414 (5th Cir. 2021).

II.

Appellants raise three issues on appeal. The first two are inadequately briefed and therefore forfeited. The third fails.

3

No. 21-30203

A.

First, appellants argue the district court erred in analyzing their claims under both Title VII and LEDL under federal precedents.

Appellants have forfeited this argument by failing to adequately brief it on appeal. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021); FED. R. APP. P. 28(a)(8)(A). A party inadequately briefs an argument when it fails to "offer any supporting argument or citation to authority" or to "identify relevant legal standards and any relevant Fifth Circuit cases." *JTB Tools & Oilfiled Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (quotation omitted). The same is true when a party fails to explain how the district court's analysis went awry. *See Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987).

Here, the district court analyzed plaintiffs' Title VII and LEDL claims together. Consistent with our precedent, the district court concluded that "the outcome of Plaintiffs' claims will be the same under the federal and state statutes." *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 n.4 (5th Cir. 2007) (noting LEDL "is substantively similar to Title VII" and it is appropriate to analyze both "only under the applicable federal precedents").

Appellants claim the district court should have "used a burden that allowed the Plaintiffs the opportunity to be heard at trial on the State issues that are continuing in nature." But they do not cite any authorities suggesting a different standard was appropriate. Nor do they explain how the district court went wrong. This argument is forfeited.

B.

Second, appellants argue the district court should not have dismissed Stewart's claims as voluntarily waived. This argument is likewise inadequately briefed.

The district court identified the correct legal standard for waivers of Title VII claims. The court explained that a release of Title VII claims is valid if it is "knowing and voluntary." *Rogers v. Gen. Elec. Co.*, 781 F.2d 452, 454 (5th Cir. 1986). Once an employer establishes a knowing and voluntary waiver, the district court further noted, it is the employee's burden to demonstrate the release was "invalid because of fraud, duress, material mistake, or some other defense." *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935 (5th Cir. 1994).

The district court correctly applied that standard. Stewart signed an agreement that "waived, compromised, released and otherwise discharged EMS from any suit, claim or cause of action specifically included but not limited to any claim of wrongful termination or violations of 42 U.S.C. § 1983 or Title VII of the Civil Rights Act, resulting from, created by, or relating to" Stewart's employment with EMS. As the district court noted, Stewart was represented by counsel when he negotiated this agreement, and his attorney was the one who presented the waiver—thus suggesting that Stewart knowingly and voluntarily signed it. Appellants "provide[d] no evidence that Stewart was coerced into signing the Resolution, that he did so without knowledge of its contents, that the Resolution was fraudulent, or that there was some other legally valid reason" to disregard it. So the court found Stewart waived his claims.

Here, appellants do not provide "even the slightest identification of any error in [the district court's] legal analysis." *Brinkmann*, 813 F.2d at 748. They again cite no cases and provide no reason to doubt the district court's reasoning. They merely assert that Stewart's claims "should not be dismissed" because the waiver was "not consensual." They imply that Stewart's waiver was entered into without consideration or that the loss of a month's pay created duress. But those objections are incoherent given that EMS gave Stewart his thirty-day suspension as a concession; he would

otherwise have faced termination. This argument is inadequately briefed and therefore forfeited on appeal.

## C.

Finally, appellants argue the district court failed to "consider[] the totality of circumstances" and wrongly granted summary judgment to appellees on their Title VII claims. We disagree.

### 1.

Appellants ask us to reverse the grant of summary judgment on their hostile work environment claim. To survive summary judgment on this claim, appellants must show a genuine dispute of material fact regarding whether they were subject to "severe or pervasive" harassment that "create[d] an abusive working environment." *West v. City of Houston*, 960 F.3d 736, 741–42. (5th Cir. 2020) (quotation omitted).

As appellants correctly note, courts must look "at all the circumstances" to determine whether "an environment is 'hostile' or 'abusive.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). To that end, courts consider (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating, or a mere offensive utterance, and (4) whether it unreasonably interferes with an employee's work performance. *West*, 960 F.3d at 742. "[N]o single factor is determinative." *Id.*

Here, appellants highlight six specific instances of alleged sex discrimination. They argue these incidents were "not isolated." But every example they provide is a minor incident alleged to have occurred only once over a period of many years. Where the "complained-of actions were isolated or infrequent," appellants "cannot show that [their] harassment was frequent or pervasive." *West*, 906 F.3d at 742; *see also Faragher v. City of Boca*

No. 21-30203

*Raton*, 524 U.S. 775, 788 (1998) ("isolated incidents" will not suffice "unless extremely serious"). None of these incidents were physically threatening or humiliating, nor did any of them unreasonably interfere with appellants' work performance.

Other than those specific incidents, appellants point to some allegedly discriminatory conduct they say happened regularly. For example, they claim that female employees were allowed to take slightly longer breaks. And they allege that male employees were disciplined when female employees who engaged in the same conduct were not. Even assuming the truth of these allegations, and that they happened as frequently as appellants say they did, they are insufficient to demonstrate a hostile working environment. *See Harris*, 510 U.S. at 21–22 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.").

Appellants fault the district court for "looking at the facts alleged in a piecemeal manner." But it was appropriate for the district court to evaluate the frequency of the alleged discriminatory conduct. And the court properly determined that, even taking all the allegations as true, the conduct described could not support a claim for harassment because it was "relatively infrequent" and "not severe or pervasive."

Appellants failed to show a genuine dispute of material fact regarding whether they were subject to severe or pervasive harassment. Accordingly, the district court did not err in granting summary judgment on the hostile work environment claim.

2.

Appellants also ask us to reverse the grant of summary judgment on their disparate treatment and retaliation claims.

To succeed on these claims, appellants must first establish a *prima facie* case of discrimination. For disparate treatment, appellants must show (1) they were members of a protected class; (2) they were qualified for their positions; (3) they suffered an adverse employment action, and (4) that others similarly situated were treated more favorably. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006). For retaliation, they must establish (1) they participated in an activity protected by Title VII; (2) EMS took an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *McCoy*, 492 F.3d at 557. If appellants can establish a *prima facie* case, then the burden shifts to EMS "to articulate some legitimate, nondiscriminatory or nonretaliatory reason" for its action. *Id.*

Our analysis starts and ends with appellants' alleged "adverse employment action." Appellants cannot establish such an action for either their disparate-treatment claims or their retaliation claims. That means they cannot establish a *prima facie* case, and therefore, the district court did not err in dismissing their claims.

In the disparate-treatment context, an "adverse employment action" is an "ultimate employment decision[] such as hiring, granting leave, discharging, promoting, or compensating." *McCoy*, 492 F.3d at 559 (quotation omitted). That includes a constructive discharge, which occurs when "an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quotation omitted).

The three dispatchers who resigned from EMS argue they were constructively discharged. As already discussed, they have not alleged conduct that amounts to severe and pervasive harassment. And constructive

discharge requires showing a greater degree of harassment than is required to establish a hostile work environment. *See Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 841 (5th Cir. 2015) (citing *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998)). Appellants cannot make that showing here. Because there was no constructive discharge, there was no adverse employment action, and they cannot establish a *prima facie* case of disparate treatment.

In the retaliation context, an "adverse employment action" is "any action that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *McCoy*, 492 F.3d at 559 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). In their briefs before this court, appellants claim Vidrine "suffer[s] retaliation for his part in bringing suit," but they have not identified any action that would have dissuaded a reasonable employee from suit. Even taking all of Vidrine's allegations as true, none rises to that level. So again, appellants' *prima facie* case fails.

The district court did not err in granting summary judgment on appellants' disparate treatment and retaliation claims.

AFFIRMED.

Jᴇɴɴɪғᴇʀ Wᴀʟᴋᴇʀ Eʟʀᴏᴅ, *Circuit Judge*, concurring in part and dissenting in part:[1]

The majority holds that summary judgment was proper because appellant-employees failed to show a genuine dispute of material fact regarding whether they were subjected to severe or pervasive harassment based on their sex in violation of Title VII. *Ante* at 6–8. Because I believe that there was a genuine dispute of material fact regarding the claims of all four employees, I would hold that summary judgment was improper. Accordingly, I respectfully dissent from Section II.C.1. of the majority's opinion.

I.

For a hostile workplace claim to succeed under Title VII, discriminatory behavior must so thoroughly permeate the work environment that it is "sufficiently severe *or* pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (emphasis added) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).[2]

Whether there was such a work environment depends on the totality of the circumstances. *Id.* at 23. We consider four factors: (1) how often

---

[1] I concur in parts II.A., II.B., and II.C.2. of the majority's opinion regarding, respectively, the employees' claims that the district court: (1) failed to use "a burden that allowed the Plaintiffs the opportunity to be heard at trial on the State issues that are continuing in nature"; (2) should not have dismissed of one of the employee's claims as voluntarily waived; and (3) improperly granted summary judgment on the employees' disparate treatment and retaliation claims.

[2] To violate Title VII, the offending employee need not engage in conduct that is severe *and* pervasive. Rather, as we have emphasized, either "severe *or* pervasive" discriminatory conduct is sufficient. *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 483 (5th Cir. 2002); *see also E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013) (*en banc*) ("To affect a term, condition, or privilege of employment, the harassing conduct 'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" (alteration in original) (citation omitted)).

discriminatory conduct occurred; (2) how severe the conduct was; (3) whether the conduct involved physical threats or humiliation, or was "a mere offensive utterance"; and (4) whether the conduct unreasonably interfered with an employee's job performance. *West v. City of Houston*, 960 F.3d 736, 742 (5th Cir. 2020) (citing *Harris*, 510 U.S. at 23)).

Further, we employ an objectively reasonable person standard when assessing workplace hostility. *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013) (*en banc*). We must consider "[c]ommon sense, and an appropriate sensitivity to social context" so that Title VII does not become "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82, 80 (1998). The inquiry is therefore fact intensive. *Boh Bros.*, 731 F.3d at 460.

In *Boh Bros.*, we held *en banc* that there was enough evidence for the jury to conclude that the harassment was "sufficiently severe or pervasive." *Id.* at 461. There, one employee "hurled raw sex-based epithets uniquely at [the victim] two-to-three times a day, almost every day, for months on end." *Id.* The offending employee also exposed his genitals to the victim about ten times (often while smiling and waving), once suggested that he would put his penis in the victim's mouth, and would "approach [the victim] from behind and 'hump' him two to three times per week" for months. *Id.* at 449–50, 459.

We reached the same conclusion in *Farpella-Crosby v. Horizon Health Care*, in which the offending employee questioned the victim's sexual activities or made comments that were "offensive" or "egregious" two or three times per week. 97 F.3d 803, 806 (5th Cir. 1996). The comments were

No. 21-30203

"so frequent that [the victim] could not possibly remember each instance." *Id.* at 805.[3]

Conversely, we have held that allegations of workplace discrimination were not "sufficiently severe or pervasive" to survive summary judgment when the victim alleged a sole "offensive joke concerning condoms." *Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir. 1996).

## II.

Given the abundance of evidence provided by the employees, there is a genuine dispute of fact whether Appellee's conduct amounted to a hostile workplace.  Looking to the four factors from *West*—frequency, severity, physical threat or humiliation, and interference with work performance—the employees allege sufficient facts to raise a genuine dispute about a hostile workplace.

Although the timeline of this case is marked by discrete incidents over a period of years (like supervisor Stacy Simmons allegedly saying that she "does not like men"),  the employees allege many ongoing discriminatory

---

[3] We have made similar decisions in cases of workplace discrimination based on race. *See, e.g.*, *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 400–04 (5th Cir. 2021) (holding that there was a fact issue because employees referred to the victim by racial epithets twice, addressed the victim using arguably offensive terms, there were other occasions when similarly offensive language was used when the victim was not present, and the victim's efforts at work were sabotaged on more than one occasion); *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400–01 (5th Cir. 2007) (holding that there was a fact issue regarding whether harassment was "severe or pervasive" when the victim was called racial epithets "on a regular basis for a period of approximately one year" (often several times per day), and when employees "mocked [the victim's] diet and prayer rituals," made several comments indicating that he was a terrorist, and "frequently banged on the glass partition of [his] office[] in order to startle him"); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (holding that there was a fact issue stemming from offensive racial remarks toward the victim that began when she was hired and continued regularly for three years until she resigned).

behaviors.  And, at this stage, we must accept those allegations as true.  For example, male employees were supposedly routinely denied leave during the workday, but female employees were allegedly rarely, if ever, denied leave to handle personal business, even if it was for social activities like church functions or shopping.  Female employees were allegedly often permitted to take leave without using their predetermined leave hours.  In addition to leave, female employees allegedly were frequently permitted to take longer breaks and lunches.  Female employees allegedly were permitted to take additional smoke breaks without using leave.  And when a male employee was dispatched to pick up lunch for the group, he was given 30 minutes.  But female employees were allegedly regularly given 60 to 90 minutes.  Although all employees received the same number of breaks per day on paper, female employees allegedly were often given priority on when to take those breaks.

Moreover, the employees allege routine disparities in punishment between male and female employees for the same infraction.  Granted, these were often minor—Larry Whitmore claims that he was reprimanded for changing the font settings on his computer and for being five minutes late to a shift when female employees were not—but that makes them no less pervasive.  There was also apparently a double standard for watching videos and movies during down time on a shift.

As the Supreme Court noted in *Harris*, Title VII prohibits employers from discriminating on the basis of "compensation, terms, conditions, or privileges of employment" because of an employee's gender.  510 U.S. at 21 (citing 42 U.S.C. § 2000e–2(a)(1)).  This includes "the entire spectrum of disparate treatment of men and women."  *Id.* (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)).  This court has indicated that discriminatory treatment in breaks and punishment may contribute to a hostile workplace. In *Whitlock v. Lazer Spot, Inc.*, we noted that a black employee's claim for a hostile work environment because he was

punished for violations that white employees were not punished for failed because of insufficient facts and only conclusory allegations.  657 F. App'x 284, 287 (5th Cir. 2016).  And in *Peterson v. Linear Controls, Inc.*, we held that a black employee's claim for a hostile work environment on the grounds that only black employees were routinely denied water breaks failed only because the conduct was not pervasive as it occurred during a ten-day period.  757 F. App'x 370, 374 (5th Cir. 2019).

In contrast, employees here point to specific facts to support their claim.  Simmons, the supervisor, allegedly disregarded male employees as a matter of course.  Both Whitmore and David Vidrine claim that Simmons would not, in Whitmore's words, "talk to male employees unless it was a necessity."  And Zachary Stewart claims that Simmons would regularly give male employees the "cold shoulder," making them answer more calls as she socialized with female employees.

In any event, the discrimination faced by the employees was just as frequent as the "weekly" or "regular" harassment that was adequately "pervasive" in *Farpella-Crosby*, *WC&M*, and *Walker*.  Just like in *Farpella-Crosby*, the incidents were so frequent that the workers could not name every single instance.  97 F.3d at 805.

The majority holds that the incidents alleged here are too "isolated or infrequent" to show that harassment was "frequent or pervasive," *West*, 960 F.3d at 742, and that the ongoing discrimination alleged by the employees is "insufficient to demonstrate a hostile working environment."  *Ante* at 6–7.  Similarly, the district court held that the employees alleged a handful of "minor, isolated incidents" of workplace harassment, only two of which "span any period of time"—that Simmons would not speak to male employees and that female employees were given longer breaks and not always required to take leave.  But these holdings do not consider the

voluminous record of additional allegations of discrimination over a long period of time, which are sufficient at the summary judgment phase under our precedent.

Not only was the harassment frequent, but it was sometimes humiliating as well. A female employee supposedly yelled and cursed at Whitmore without consequence, and other female employees mocked Stewart's prosthetic leg without repercussion.

Male employees were often expected to do more work, too—and not for more reward. Stewart claims, for example, that while male employees were sometimes expected to answer 180–250 phone calls in 12 hours, female employees answered only 50–70. Whitmore was supposedly reprimanded for not answering the phone while female employees sat around doing nothing. Vidrine made a similar claim. Female employees were often given more opportunities for overtime, training, and promotions. Steven Bozeman complained that his own wife, who also worked for Appellee, received favorable treatment in the form of a promotion, easier job assignments, and access to classes unavailable to him.

The employees' supervisor, Simmons, also allegedly made many remarks regarding the male employees' ability to succeed in the workplace. Simmons allegedly said that "there are too many men in communications," that "men were a liability to the communications office," and that it was "easier to work with females in those positions" because men lack the proper temperament and cannot multitask as efficiently as women. Simmons also allegedly stated that she "does not like men." The district court and majority hold that "[n]one of these incidents . . . unreasonably interfere[d] with the [employees'] work performance." *Ante* at 7. However, there are fact issues on this point as well—all four employees allegedly had their "opportunity to succeed in the workplace" hampered by Appellee's conduct. *See Weller v.*

*Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996) (citation omitted). In fact, three of the four employees quit their jobs, all citing a discriminatory workplace in one form or another.

Taken together, and in the light most favorable to the employees, these routine practices show that harassment was a "pervasive" element in the workplace. All four employees experienced frequent harassment that interfered with their work duties, and Stewart and Whitmore also experienced harassment that was humiliating.

*             *             *

For these reasons, there is a genuine dispute of material fact whether Appellee's behavior was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67). In my view, we should vacate the district court's judgment on the employees' hostile workplace claims. Accordingly, I respectfully dissent in part.